IDY DANZ, demandante y recurrente, *v.* MATÍAS SUAU BALLESTER, representado por su Tutor JUAN BAUTISTA ECHEVARRÍA ET ALS., demandados y recurridos.

Número 11832.

*Sometido:* 26 de marzo de 1959. *Resuelto:* 15 de mayo de 1961.

*Enrique Báez García* y *Héctor Reichard,* abogados de la recurrente; *García Méndez & García Hermida,* abogados de los recurridos.

El Juez Asociado Señor Belaval emitió la opinión del Tribunal.

Se trata de una acción donde la demandante Idy Danz requiere a Matías Suau Ballester, representado por su tutor Juan Bautista Echevarría; a Bernardo, Manuel, Bartolo, María, Carolina, Julia, Margarita, Amalia, Federico y Santiago Suau Soler, en representación de Bernardo Suau Ballester; a María Suau Ballester; a María, Bárbara y Margarita Suau Alcover en representación de Mariano Suau Ballester; a Miguel Suau Ballester y a Jaime Suau Ballester, como integrantes de la Sucesión de don Pedro Suau Ballester, la división de cierta comunidad de bienes existente entre ella y Pedro Suau Ballester. Los hermanos de Pedro Suau Ballester eran Matías Suau Ballester, Bernardo Suau Ballester, María Suau Ballester, Mariano Suau Ballester, Miguel Suau Ballester y Jaime Suau Ballester. De estos hermanos murieron antes que don Pedro Suau Ballester, Bernardo y Mariano, y en representación de ellos vienen los hijos antes nombrados.

Contestaron la demanda, oponiéndose a la pretensión de la demandante el co-demandado Matías Suau Ballester, representado por su tutor Juan Bautista Echevarría; los co-demandados Bernardo, Manuel, Bartolo, María, Carolina, Julia, Margarita, Amalia, Federico y Santiago Suau Soler (hijos de Bernardo Suau Ballester); el co-demandado Bernardo Suau Soler en su carácter de apoderado de doña María Suau Ballester y doña María Suau Alcover. Contestaron la demanda, allanándose a que se dictara sentencia a favor de la demandante, el co-demandado Miguel Suau Ballester, y las co-demandadas Bárbara Suau Alcover y Margarita Suau Alcover (hijas de Mariano Suau Ballester). No contestó la demanda Jaime Suau Ballester y su rebeldía fue anotada antes de celebrarse el juicio.

Como se ve, la situación en cuanto a las partes es la siguiente: se oponen a la demanda Matías Suau Ballester;

los hijos de Bernardo Suau Ballester de apellidos Suau Soler; María Suau Ballester y una hija de Mariano Suau Ballester, María Suau Alcover; se allanan a la demanda, Miguel Suau Ballester, dos hijas de Mariano Suau Ballester, Bárbara y Margarita Suau Alcover; y Jaime Suau Ballester, cuya rebeldía está anotada, no se opone ni se allana a la demanda.

Los hechos, en parte estipulados, en parte aceptados y en parte probados sin testimonio en contrario, puesto que los demandados opositores descansaron en una simple cuestión de derecho, son los siguientes: La demandante Idy Danz se divorció de su anterior esposo el 15 de noviembre de 1923 (t. 78) y seis meses después del divorcio (t. 82) empezó a vivir en concubinato con Pedro Suau Ballester (t. 82), hermano y tío respectivamente de los miembros de la sucesión demandada. Don Pedro era soltero (t. 84) cuando entró en la relación concubinaria. El concubinato entre don Pedro Ballester Suau y doña Idy Danz está aceptado por los co-demandados opositores aunque éstos alegaron que fue en el 1928, y no en el 1924, que empezó dicho concubinato. La prueba no contradicha de la demandante estableció que el concubinato empezó en junio de 1924.

La demandante y el causante de la sucesión demandada vivieron juntos, como concubinos, desde junio de 1924 hasta el 1ro. de junio de 1939, en cuya última fecha contrajeron matrimonio, y siguieron viviendo juntos, como esposos, hasta la fecha de la muerte de don Pedro Suau Ballester, acaecida el 25 de diciembre de 1949. Se trata, pues, de un concubinato que dura desde junio de 1924 hasta junio de 1939 seguido de un matrimonio que dura desde junio 1ro. de 1939 hasta el 25 de diciembre de 1949.

Cuando la demandante trató de probar el pacto económico entre ella y don Pedro Antonio Suau, de dividir los bienes y ganancias obtenidas desde el primer período de concubinato, los co-demandados opositores objetaron cualquier mani-

festación o prueba referente a transacciones o relaciones habidas con el difunto y la Sala sentenciadora, por este fundamento, declaró sin lugar la demanda en su totalidad.

La ley aplicable al caso es la sección 3 de la Ley de 10 de marzo de 1904 "para prescribir quiénes son testigos hábiles" etc.—32 L.P.R.A. 201–202 sección 1738—que dispone: "En las demandas por o en contra de los albaceas testamentarios, administradores o tutores en las cuales pueda dictarse sentencia a favor o en contra de ellos como tales, ninguna de las partes podrá declarar contra la otra en lo referente a transacciones con, o relaciones hechas por el testador, intestado o pupilo, a menos que fuere llamado a declarar por la parte contraria; y las prescripciones de esta sección se aplicarán a todas las demandas por o en contra de los herederos y representantes legales de un finado, que se suscitaren de transacciones habidas con éste."

■ Lo primero que nos llama poderosamente la atención, es que en este caso, la ilustrada Sala sentenciadora declaró sin lugar la demanda contra Miguel Suau Ballester y las dos hijas de Mariano Suau Ballester, Bárbara y Margarita Suau Alcover que se allanaron a que se dictara sentencia a favor de la demandante y contra Jaime Suau Ballester, cuya rebeldía estaba anotada. Tal parece que la ilustrada Sala sentenciadora llegó a la conclusión que habiendo prevalecido la cuestión de derecho planteada por algunos de los codemandados, todos los demás quedaban obligados por dicha resolución.

La regla que cualquier resolución favorable en favor de uno o más partícipes beneficia a los otros partícipes en una propiedad poseída en común, y por el contrario, cualquier resolución adversa perjudica sólo al que la promovió, —*Flores* v. *Rodríguez*, 77 D.P.R. 720 (Belaval, Snyder, Negrón Fernández), (1954), cita precisa a las págs. 724–726—parte del supuesto que no exista ninguna acción afirmativa en contrario de parte de los otros condóminos, pues cada uno de

·ellos tiene pleno derecho de disposición de sus respectivos derechos dentro de la cosa poseída en común. Como bien afirma Castán, los derechos que se relacionan con la porción o cuota individual en el interés en común "se caracterizan por el de autonomía de cada partícipe. Todo condueño—dice el art. 399 del Código (333 del Código Civil de Puerto Rico)—tendrá la plena propiedad de su parte y la de los frutos y utilidades que le correspondan, pudiendo, en su consecuencia, enajenarla, cederla o hipotecarla y *aun sustituir otro en su aprovechamiento*"—2 Castán, Derecho Civil Español y Foral, 348 (Novena edición de la Editorial Reus de 1957).

La "Sucesión" como persona jurídica no existe en ·nuestro derecho—*Arvelo et al.* v. *Banco Ter. y Ag. de Puerto Rico*, 25 D.P.R. 728, (Hernández, Presidente), (1917), cita precisa a la pág. 736; *Vega* v. *García*, 61 D.P.R. 99 (Del Toro), (1942), cita precisa a las págs. 101–102; *Sucn. Belaval* v. *Acosta*, 64 D.P.R. 109, (Travieso), (1944), cita precisa a las págs. 110 *in fine* y 111; *Godreau* v. *Godreau & Cía.*, 64 D.P.R. 325 (Travieso) (1944), cita precisa a la pág. 332; *Fuentes* v. *Tribunal de Distrito*, 73 D.P.R. 959 (Ortiz), (1952), cita precisa a la pág. 987. Como la "Sucesión" no es una entidad distinta y separada de las personas que la componen, cada uno de los demandados en este caso puede adoptar una actitud diferente frente a la demanda y su derecho debe ser juzgado separadamente.

Esta separabilidad individual del interés en común lo hemos consagrado en nuestra jurisprudencia *González* v. *Sucn. Díaz*, 69 D.P.R. 643, (Todd hijo) (1949), cita precisa a las págs. 652–653 y 658. El artículo de nuestro Código ·Civil pues, que debemos aplicar, no es el general, el art. 326 sino el especial, el art. 333 que dispone: "Todo condueño tendrá la plena propiedad de su parte y la de los frutos y utilidades que le correspondan, pudiendo en su consecuencia, enajenarla, cederla o hipotecarla, y aún sustituir otro en su

aprovechamiento y darla en arrendamiento, salvo si se tratare de derechos personales, pero el efecto de la enajenación o de la hipoteca con relación a los condueños, estará limitado a la porción que se les adjudique en la división al cesar la comunidad y el efecto del arrendamiento será conferir al arrendatario durante el término del contrato, las facultades del condueño en orden a la administración y mejor disfrute de la cosa común."

El caso de *McCormick* v. *McCormick*, 64 D.P.R. 296, (Todd hijo) (1944) que parece haber creado cierta confusión en este sentido, comprende una situación distinta. En él se trataba de la nulidad de una partición, en cuya acción de partición la corte había adquirido jurisdicción sobre unos herederos citados personalmente y no había adquirido jurisdicción sobre otros herederos citados por edictos. Los herederos que fueron citados por edictos obtuvieron la nulidad de la partición por no haber sido debidamente emplazados. (Pág. 297.) Entonces los herederos citados personalmente acudieron a la Corte alegando que siendo nula la sentencia en cuanto a los cuatro demandados que fueron emplazados indebidamente, la sentencia de partición no podía subsistir en cuanto a los demás demandados "por la naturaleza misma de la partición". Sabido es que el fenómeno que produce la partición es terminar la universalidad de bienes y derechos que se transmite indeterminadamente a todos los herederos e individualizar los patrimonios. Lo que se resolvió en el caso fue que "la sentencia de nulidad de la partición tuvo por objeto restituir los bienes de la herencia a su estado inicial de indivisión" (pág. 301) y siendo un caso de sentencia indivisible, la revocación parcial de la misma afectaba a todos los partícipes (pág. 302 in fine).

Pero en el presente caso la situación es distinta, por tratarse de un interés que nuestro propio derecho ha declarado autónomo y divisible; además aquí no se trata siquiera de una partición de herencia sino de la liquidación de una socie-

dad concubinaria seguida de una sociedad de gananciales. Sabido es que la sociedad de gananciales se rige por las reglas del contrato de sociedad—art. 1298—en todo aquello no previsto por las disposiciones típicas que la rigen contrario a la división de la comunidad de bienes que se rige por las reglas concernientes a la herencia—art. 340. El hecho de que la acción se titule "división de comunidad" no altera el problema jurídico, en cuanto a los bienes adquiridos durante el período de concubinato, y autoriza la separabilidad de los derechos correspondientes a la liquidación, que siempre es un paso previo a la partición del caudal relicto. Como cuestión de realidad, esta acción se titula "división de ·comunidad" para conformarse a cierta acepción, poco afortunada, de nuestra jurisprudencia sobre las sociedades de hecho que crea el concubinato.

▬ En cuanto a la partición de Jaime Suau Ballester, tal parece que la ilustrada Sala Sentenciadora partió del supuesto, que por constituir la sección 3 de la Ley de 10 de marzo de 1904 una defensa absoluta, no se podía deducir de su incomparecencia una renuncia implícita a la prohibición de declarar la demandante sobre el pacto o transacción con el finado. Desde el caso de *Cestero* v. *Sucn. Cestero*, 35 D.P.R. 991 (Wolf) (1926), cita precisa a la pág. 933 se resolvió por este Tribunal: "La apelante está equivocada al suponer que la inhabilidad (*incompetency*) de un testigo según la sección 3 de la Ley de 1904 es absoluta. El estatuto mismo demuestra que puede ser fácilmente renunciado si el testigo es llamado por la parte contraria". Posteriormente se resolvió que la prohibición se refería exclusivamente a las *partes* y no a las *personas particulares* que tuvieran conocimiento del pacto o la transacción realizada con el finado —*Lezcano* v. *Sucn. Sifonte*, 42 D.P.R. 400 (Texidor), (1931), cita precisa a la pág. 402. Es indudable que la incomparecencia en autos de Jaime Suau Ballester equivale a una renuncia de cualquier incapacidad que hubiera podido tener

la demandante para declarar sobre el pacto o transacción con el finado y la ilustrada Sala sentenciadora ha debido permitir el testimonio de la demandante a los fines de establecer el pacto económico entre la demandante y el finado durante el primer período de concubinato.

Ahora bien, en cuanto a los otros miembros de la Sucesión que se opusieron a la demanda la situación varía. Si bien de acuerdo con el caso de *Pereles* v. *Martinó*, 73 D.P.R. 848 (Pérez Pimentel), (1952), cita precisa a las págs. 853–856, la demandante no podría probar el pacto económico durante el concubinato mediante manifestaciones verbales del finado por ser prueba que sólo podría contradecir otra parte con los labios sellados por la muerte, y no haber renunciado a dicha prohibición las partes interesadas, esto no cierra la posibilidad de que pueda probarse dicho pacto en otra de las formas provistas por nuestra propia jurisprudencia.

En el caso de *Torres* v. *Roldán*, 67 D.P.R. 367 (Snyder), (1947), cita precisa a las pág. 369 se estableció la siguiente doctrina: "Sin embargo, si un hombre y una mujer mientras viven en concubinato convienen, expresa o implícitamente, en consolidar sus ingresos y participar por partes iguales en los bienes adquiridos con los mismos, las cortes exigirán de la parte que ha retenido más de lo que le corresponde, de acuerdo con lo convenido, que entregue dicho exceso . . . (Citas.)

"Es más, aun en ausencia de un convenio expreso o *implícito*, con miras a evitar un enriquecimiento injusto por parte del demandado, el demandante tiene derecho a participar, en la proporción que sus fondos hayan contribuido a su adquisición en los bienes acumulados conjuntamente."

Como se ve, fuera del pacto expreso probado con las propias palabras del finado, —*Pereles* v. *Martinó*, supra—la demandante tiene derecho a probar dicho pacto o su derecho a cierta participación en los bienes, en cualquiera de estas alternativas: (1) como pacto expreso si se puede probar,

mediante el testimonio de personas particulares ajenas a la relación concubinaria *Lezcano* v. *Sucn. Sifonte*, supra; (2) como pacto implícito que se desprende espontáneamente de la relación humana y económica existente entre las partes durante el concubinato *Torres* v. *Roldán*, supra; (3) como un acto justiciero para evitar el enriquecimiento injusto, reconociendo el valor de los bienes, valores o servicios aportados por la concubina y sus correspondientes ganancias.

En el caso que ahora nos ocupa, la demandante alegó que mientras duró el concubinato tuvo un sueldo fijo, recibió una pensión de su anterior marido, fue favorecida por una herencia de su padre e hizo operaciones hipotecarias con bienes propiedad de ella, todo lo que, posiblemente pasó a formar parte del caudal concubinario y posiblemente entrara en una forma indeterminada, a formar parte del caudal ganancial posterior. Parece que la ilustrada Sala sentenciadora no estuvo dispuesta a recibir dicha prueba, o a darle su efecto probatorio correspondiente, por considerarla relacionada con el pacto de división. Declarar que esto no pueda probarse en virtud de una ausencia de pacto en cuanto al modo o manera de adjudicar los bienes, por la prohibición de la sección 3, sería consagrar una injusticia y como quiera que se produzca este estado de derecho, deber nuestro es atemperar la ley a la justicia, especialmente después de haber nosotros establecido el principio que "en ausencia de un convenio expreso o implícito, con miras a evitar un enriquecimiento injusto por parte del demandado, el demandante tiene derecho a participar, en la proporción que sus fondos hayan contribuido a su adquisición, en los bienes acumulados", *Torres* v. *Roldán*, supra. Nada de lo aquí expuesto debe interpretarse como extensivo a la división de los bienes gananciales, propiamente dichos, que debe resolverse separadamente según lo dispuesto por ley.

Ni en el caso de *Torres* v. *Roldán*, ni en el de *Pereles* v. *Martinó*, ni en este caso, se nos ha planteado con toda

formalidad como cuestión jurídica y con vista a la prueba del caso, la conveniencia de estudiar las uniones maritales de hecho, y su posible entronque con la sociedad universal de ganancias y pérdidas, la comunidad de bienes, el mandato implícito etc., sobre todo en cuanto al concubinato *moreuxorio* "caracterizado por la unión de un hombre y una mujer con vida común, asidua y permanente a la manera del matrimonio" Puig Peña. "Las Uniones Maritales de Hecho"—393 Revista de Derecho Privado, págs. 1086–1103, número correspondiente a diciembre 1949; véase además Luis Loreto —"Comunidad de Bienes entre Concubinos" 374–375 Revista de Derecho y Legislación, págs. 181–192 y número correspondiente a julio-agosto 1942 y 2 Planiol-Ripert—Tratado Práctico de Derecho Civil Francés, págs. 63–65, (edición de la Cultural S. A. de la Habana de 1939). No es este el momento apropiado para examinar las diversas teorías y el juego de las figuras jurídicas que entrarían en este estudio merecedor de un sereno juicio y exhaustivo estudio. Pero se nos ocurre pensar que en la ampliación progresiva de los conceptos anteriormente restringidos por la concepción arquetipal del derecho de familia, el problema debe empezar a preocuparnos.

*Debe revocarse la sentencia apelada y devolverse el caso a la Sala sentenciadora para su acción correspondiente en forma no incompatible con los fundamentos aquí expuestos.*