CELESTINA CARABALLO RAMÍREZ, demandante y recurrente, *v.* MANUELA ACOSTA Y OTROS, demandados y recurridos.

*Número:* R-75-113          *Resuelto:* 18 de diciembre de 1975

*Manuel Martín Maldonado,* abogado de la recurrente; *Leonardo Llequis,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Probado que un hombre casado, vigente su matrimonio, entra en una relación extra marital o de concubinato (¹) con otra mujer, relación que dura hasta el momento de su muerte treinta y ocho años después; que al iniciarse esa relación ni él ni la concubina tenían bienes de fortuna; y que durante toda la vigencia de esa relación la mujer aportó de su esfuerzo y su trabajo tanto o más que él para producir un capital que a su óbito se estima en más de $90,000, ¿qué derechos tiene esa mujer contra la sociedad legal de gananciales que al mismo

(¹) No es necesario que nos decidamos aquí por una clasificación de la relación extra marital, a manera de matrimonio (*more uxorio*), entre un hombre y una mujer, a base de su aptitud potencial para contraer matrimonio. La clasificación de esa relación como "concubinato" o "queridato," dependiendo de la aptitud de los partícipes para contraer matrimonio, puede ser de importancia en otras jurisdicciones en que se atribuyan a esa relación distintos efectos legales (*v. gr.* la clasificación y posibilidad de legitimación o reconocimiento de los hijos). Zannoni Eduardo, *El Concubinato* (Ed. 1ra., 1970), pág. 125, llama "concubinato" a esa relación cuando sus partícipes están en aptitud de casarse por ser ambos solteros (divorciados o viudos), y "queridato" cuando uno o ambos están casados con otra persona y por tanto impedidos de casarse entre sí. En Puerto Rico los efectos legales de esa relación, llámese concubinato o queridato, son esencialmente los mismos. Baste, en cuanto a los hijos nacidos de esa relación, que aquí, una vez establecida su filiación, son hijos, sin más calificativo. Véase *Ocasio* v. *Díaz,* 88 D.P.R. 676, 749 (1963).

tiempo existía entre el concubinario y su esposa? De tener algunos, ¿qué grado de prueba se requiere que ella aduzca para determinar su aportación y la porción que le corresponde en los bienes? Esos son los planteamientos ante nuestra consideración.

En 1973 Celestina Caraballo Ramírez, conocida por Celia Caraballo Ramírez, demandó a Manuela Acosta y a los herederos de Juan Seda Ramos. Alegó la existencia de una comunidad de bienes e intereses económicos durante treinta y ocho años de concubinato con Juan Seda Ramos y hasta el fallecimiento de éste en 1972, y reclamó de su viuda Manuela Acosta y de los componentes de su sucesión el pago de su participación en el caudal relicto a su fallecimiento. Los demandados negaron la existencia de la comunidad de bienes y reconvinieron para reclamar de la demandante que desalojara la casa en que vive, por ser propiedad de la sociedad de gananciales que existió entre Manuela Acosta y Juan Seda Ramos; que rindiera cuentas de la operación de un negocio de cafetín también propiedad de dicha sociedad de gananciales; y que pagare una renta por el uso de la casa hasta la fecha en que la desocupare y devolviere otras rentas que, según alegaron, ella cobraba sobre otra propiedad también perteneciente a la sociedad de gananciales.

El tribunal de instancia, luego de aquilatar las pruebas presentadas por las partes, concluyó que al ocurrir el fallecimiento de Juan Seda Ramos quedaron bienes inmuebles y una suma de dinero en efectivo por un valor total de $95,726.29, (²) y, sin hacer determinación sobre qué clase de relación económica generó la unión extra marital entre Celestina, o Celia, y Juan Seda Ramos, fijó en $15,000 la participación que a ella corresponde en dicho caudal. A solicitud de la demandante decidimos revisar la sentencia. (³)

---

(²) Véase la Núm. 7 de las Determinaciones de Hechos.

(³) Los demandados recurrieron también contra la sentencia. Por resolución de 22 de mayo de 1975, reconsideración denegada el 12 de junio

Para una mejor comprensión de los méritos de los planteamientos de la recurrente, relacionamos a continuación las determinaciones de hechos numeradas una a siete:

"1. Doña Celestina Caraballo, de 72 años de edad y conocida como Celia, vivió en concubinato con don Juan Seda Ramos desde el año 1935 hasta el momento del fallecimiento de éste en 11 de agosto de 1972. Esta relación concubinaria coexistió por espacio de treinta y ocho años junto al lazo matrimonial establecido desde 1932 entre Seda Ramos y la codemandada Manuela Acosta quienes procrearon cuatro hijos. Al iniciar esta relación con doña Celia en 1935 éste no poseía propiedades o bienes de fortuna.

2. Meses después de comenzar estas relaciones extra-maritales, don Juan fue a presidio a cumplir una condena de doce años y estuvo confinado por espacio de ocho años. Durante ese período tanto Celia como Manuela le visitaban. La primera permaneció viviendo en el hogar de familiares de don Juan dedicándose durante esos ocho años al servicio doméstico en casa de familias vecinas. Durante ese período ahorró aproximadamente $200.00 y al salir don Juan de presidio ella compró una casita vieja de madera al lado del manicomio por $25.00 y animales.

3. Desde entonces Juan Seda hizo vida en común con doña Celia. Establecieron hogar en Monacillos y luego en el Barrio Camarones de Guaynabo. Todos los hijos de él la conocían y la visitaban desde pequeños estableciendo una buena relación. Su hija Sarahí Seda conocía desde niña que su padre llevaba relaciones extramaritales con doña Celia y a los quince años de edad pasó unas vacaciones por mes y medio con ella en Monacillos. Ramón Enrique, hijo de don Juan, también pasó temporadas en el hogar constituido por doña Celia y su padre en Monacillo. [sic] Esa comunidad de vida se prolongó en forma contínua hasta la muerte de Juan Seda. Sus hijos y su viuda al momento de su muerte acudieron al hogar que éste había establecido con doña Celia Caraballo en el Barrio Camarones de Guaynabo y allí le velaron.

4. Juan Seda Ramos fue un hombre de trabajo, diestro en el oficio de mecánico. Murió a los 70 años de edad casado con doña Manuela Acosta. A pesar de que ingeriá [sic] mucho licor

de 1975, nos negamos a expedir el auto de revisión por ellos solicitado (Caso R-75-134).

siempre trabajó hasta el año 1967. En el año 1965 se determinó que estaba incapacitado para ejercer su cargo como trabajador de conservación en el Hospital de Psiquiatría. El Sr. Seda Ramos había radicado una solicitud de pensión por incapacidad no ocupacional. Su historial de trabajo para fines de este litigio comienza después de salir del presidio en 1943. Estuvo unos meses haciendo labor de herrería en el Hospital de Psiquiatría. Trabajó aproximadamente dos años durante el período de 1944 a 1946 en la base de Ceiba en Fajardo. Desde el 1947 al 12 de julio de 1965 prestó servicios como trabajos de conservación en el Hospital de Psiquiatría. Comenzó con un sueldo de $125.00 y al retirarse en 1965 recibía $190.00. Mientras trabajaba con el gobierno era dueño de dos guaguas destinadas a transportación pública conducidas por su hijo Ramón Enrique y Benigno Caraballo, sobrino de doña Celia. Adquirió esos vehículos para el 1948 y operó una de ellas hasta el 1965. Al retirarse de su trabajo en el Hospital de Psiquiatría hacía tareas aisladas de herrería en su hogar en Guaynabo. Al momento de su muerte recibía los beneficios de Seguro Social y una pensión del gobierno. Su condición de salud no era buena durante los últimos cinco años de su vida. Durante ese período fue recluído por delirium tremens en el Hato Rey Psychiatric Hospital y en la Clínica Juliá.

5. Celia Caraballo aportó sus servicios e industria durante su relación con don Juan Seda. Ambos realizaron un esfuerzo común por mejorar su condición de vida. El administraba los bienes y los ingresos. La prueba demuestra que en adición a los ocho años en que ella se empleó como doméstica mientras él se encontraba en presidio, doña Celia comenzó a trabajar preparando y sirviendo almuerzos y comidas a los obreros de los pabellones mientras don Juan trabajaba en las calderas en el Manicomio. Esta actividad se realizó en su hogar en Monacillos por tres o cuatro años mientras duró la construcción de los nuevos pabellones del Manicomio. Doña Celia tenía animales— vacas, gallinas y 2 ó 3 cerdos que vendía. El dinero que producía la venta de comida le era entregado a don Juan Seda. Los sábados y domingos Celia preparaba alcapurrias, pasteles, bacalaítos, pastelillos y dulce de coco que vendían sus sobrinos a los empleados del Hospital de Psiquiatría. Para el año 1965 se estableció un negocio de cafetín con billar y vellonera en la propiedad del Barrio Camarones de Guaynabo donde se vendía

licor, cerveza, refrescos, dulces y arroz que era atendido por Doña Celia mañana, tarde y noche. Del producto de las ventas se compraba la mercancía para el negocio. La demandante administró dicho negocio desde el momento en que se estableció y continúa haciéndolo a pesar de que, según su propia declaración, lo dejó decaer después de la muerte de Seda Ramos.

6. Durante su relación con don Juan Seda la demandante crió cuatro sobrinos, tres de ellos huérfanos, con la ayuda de don Juan y con su propio esfuerzo consistente en hacer trabajo de lavar y planchar para comprarles ropa y calzado.

7. Juan Seda Ramos, estando casado con doña Manuela Acosta adquirió varias estructuras de madera y zinc que le fueron expropiadas en el año 1954 concediéndole como justa compensación la suma de $1,675.00. En el año 1951, casado con doña Manuela, adquirió la propiedad de 4.311 cuerdas equivalentes a 16,945.64 metros cuadrados en el Barrio Camarones de Guaynabo, Puerto Rico en la cual construyó (1) una estructura de hormigón armado dedicada a vivienda con sala, comedor, cocina, tres dormitorios, baño, marquesina, terraza y sótano preparado para vivienda, (2) una estructura de hormigón donde se estableció el negocio de colmado-cafetín atendido por doña Celia Caraballo y (3) una casa de piso de madera y techo de zinc con sala, comedor, cocina y un dormitorio. El valor total de este terreno y las estructuras es de $70,500.00. Al morir don Juan Seda dejó en cuentas y certificados de ahorro la suma de $25,226.29 que fue distribuida entre sus herederos y viuda. Los bienes muebles e inmuebles antes descritos son propiedad de la sociedad de gananciales constituída entre don Juan Seda Ramos y doña Manuela Acosta."

■ De entrada es menester señalar que a base de estos hechos no puede concederse que existiera una comunidad de bienes o una sociedad de intereses entre Celestina, o Celia, Caraballo y Juan Seda Ramos, por estar éste casado con Manuela Acosta bajo el régimen de gananciales y no haberse probado que la aportación de él al esfuerzo común con Celestina consistiera en bienes privativos suyos o fuera de procedencia privativa. *Cruz* v. *Sucn. Landrau Díaz*, 97 D.P.R. 578, 587 (1969); *Reyes* v. *Merlo*, 91 D.P.R. 136, 141–142 (1964). Pero, como señalamos en *Merlo* y ratificamos en *Sucn. Landrau*:

"Lo anteriormente expuesto no impide que se desarrolle una comunidad de bienes o cualquier otra figura jurídica respecto a bienes entre *la sociedad de gananciales como tal* y un tercero. Si para la adquisición de estas propiedades gananciales la demandante aportó dinero suyo, ella podría tener un crédito o reclamación personal contra la sociedad . . ." (Énfasis en la expresión original en *Merlo*.)

■ La segunda oración de esta cita no debe entenderse en un sentido limitativo, es decir, como que restringe el derecho de la demandante a lo que hubiese aportado en dinero a la comunidad. Así quedó resuelto definitivamente en *Danz* v. *Suau*, 82 D.P.R. 609 (1961), citado en *Sucn. Landrau*, supra, en que, luego de exponer la trayectoria de la norma desde *Torres* v. *Roldán*, 67 D.P.R. 367 (1947); *Pérez* v. *Cruz*, 70 D.P.R. 933 (1950), y *Pereles* v. *Martinó*, 73 D.P.R. 848 (1952), la concretamos para reconocer el derecho de la demandante "a cierta participación en los bienes en cualquiera de las siguientes alternativas: (1) como *pacto expreso* . . .; (2) como *pacto implícito* que se desprende *espontáneamente de la relación humana y económica* existente entre las partes durante el concubinato . . .; (3) como un *acto justiciero* para evitar el enriquecimiento injusto, reconociendo el valor de los bienes, valores o servicios aportados por la concubina y sus correspondientes ganancias." (Énfasis dado en *Sucn. Landrau*.)

■ Dicho de otro modo, la concubina puede probar la existencia de una comunidad de bienes, sea porque así se hubiese convenido expresamente, o sea porque la conducta de las partes—la relación humana y económica entre ellas—demuestra que se obligaron implícitamente a aportar, y aportó cada una bienes, esfuerzo y trabajo para beneficio común. En defecto de probar dicho pacto expreso o implícito, es decir, que no se pruebe la existencia de la comunidad de bienes, la concubina podría probar que aportó bienes, valores y servicios, que estos produjeron ganancias, y como un acto

482

justiciero para evitar el enriquecimiento injusto de la otra parte, reclamar el valor de dichos bienes, valores y servicios y sus correspondientes ganancias. ([4])

En la número ocho de sus determinaciones sobre los hechos, concluyó el Tribunal de instancia:

"8. Los *servicios* prestados por doña Celia Caraballo y su *aportación en esfuerzo e industria* durante la relación concubinaria ciertamente tienen valor. No recibió remuneración por ellos. La tarea de establecer una cuantía específica, reconocido el hecho de que sí hizo aportación de valor, se enfrenta a la dificultad de poder hacer una determinación o cómputo exacto. Ello no priva a la demandante de su derecho. La parte demandada, a través de preguntas hechas por su abogado en corte abierta a la demandante, admitió haberle ofrecido $15,000.00 por su aportación. Nada se lograría con señalar este caso para ulterior vista con el fin de computar y fijar una suma exacta, mayor o menor de $15,000.00 puesto que sencillamente no existe la data necesaria para ello. Ante esta situación el Tribunal fija como indemnización justa y razonable la suma de quince mil dólares—a doña Celia Caraballo." (Énfasis del tribunal de instancia.)

El énfasis puesto en los *"servicios* prestados" por la demandante y la dificultad en determinar su valor, y finalmente la concesión de $15,000 como "indemnización"—"indemnizar" es "resarcir de un daño o perjuicio" según el Diccionario de la Real Academia, Ed. 1972—sugieren que el tribunal sentenciador optó por la teoría del enriquecimiento injusto. No estamos de acuerdo.

Aquí no se probó la existencia de un pacto expreso para constituir una comunidad de bienes, pero difícilmente puede

([4]) Puig Peña discute cuatro teorías para la liquidación o partición de los bienes adquiridos durante el "estado de comunidad seudomatrimonial," a saber: (1) teoría de la sociedad de hecho; (2) teoría de la comunidad de bienes; (3) teoría del enriquecimiento injusto; y (4) teoría de la equidad. *Las uniones maritales de hecho*, 33 Rev. Der. Priv., págs. 1096–1103 (1949). Nuestra jurisprudencia se ha orientado hacia el reconocimiento de la comunidad de bienes, expresa o implícita, y a la aplicación de la teoría del enriquecimiento injusto cuando no se prueba la existencia de la comunidad de bienes. Ver casos citados en la opinión.

concebirse una situación de hechos mejor ilustrativa de un pacto implícito que la que aquí consideramos. No es necesario que repitamos las determinaciones del tribunal de instancia, pero valga puntualizar que ni siquiera se guardaron en este caso las apariencias de esposa ofendida por una relación que no le era extraña, pues su hija Sarahí desde niña visitaba a Celestina y llegó a pasar vacaciones de mes y medio con ella; su hijo Ramón Enrique también "pasó temporadas en el hogar constituido por doña Celia y su padre en Monacillo"; desde que salió de presidio en 1943 hasta que murió en 1972 el hogar de Juan Seda Ramos no era el de su esposa Manuela y sí el de su concubina; y, al producirse su muerte, sus hijos y la viuda "acudieron al hogar que éste había establecido con doña Celia Caraballo en el Barrio Camarones de Guaynabo y allí lo velaron." Esto en cuanto a la relación humana de que hablamos en *Danz* v. *Suau*, supra, y ratificamos en *Sucn. Landrau*, supra. Sobre la relación económica las determinaciones del tribunal a quo son más elocuentes.

Establecido que entre Celestina Caraballo y la sociedad legal de gananciales Seda Ramos-Acosta se constituyó por acuerdo implícito una comunidad de bienes, debe recurrirse al articulado del Código civil que define y regula esta institución. El Art. 326, 31 L.P.R.A. sec. 1271, dispone:

"Hay comunidad cuando la propiedad de una cosa o de un derecho pertenece pro indiviso a varias personas.

A falta de contratos o disposiciones especiales, se regirá la comunidad por las prescripciones de las secs. 1271 a 1285 de este título."

Los artículos que siguen constituyen derecho supletorio que rige en ausencia de pactos entre las partes o disposiciones especiales de ley. Y el número 327, 31 L.P.R.A. sec. 1272, da la norma para fijar la participación de cada parte. Dice así:

"El concurso de los partícipes, tanto en los beneficios como en las cargas, será proporcionado a sus respectivas cuotas.

Se presumirán iguales, mientras no se pruebe lo contrario, las porciones correspondientes a los partícipes en la comunidad."

■ Establecida la existencia de una comunidad de bienes entre la demandante y la sociedad de gananciales de que Juan Seda Ramos era administrador, competía a los demandados demostrar que la participación de ella era menos del cincuenta por ciento del valor de los bienes. En ausencia de esa prueba, se presume que las porciones de ella y de la sociedad de gananciales que existió entre Juan Seda Ramos y Manuela Acosta son iguales. Los hechos que halló probados el tribunal sentenciador, lejos de rebatir esta presunción, la fortifican.

El tribunal a quo no hizo determinación alguna sobre aportaciones de la esposa de Juan Seda Ramos al esfuerzo común de éste y de la demandante para la adquisición de bienes e incrementar el caudal. Es de presumirse por tanto que ninguna aportación hizo. Ello implica que sólo dos personas —Juan Seda Ramos y Celestina Caraballo—laboraron para acumular la riqueza que hoy aprovecha a la viuda de Seda Ramos como partícipe en la sociedad de gananciales que por ministerio de ley existió desde que se casaron hasta que él murió.

Al iniciarse la comunidad, nadie aportó capital. Durante sus primeros ocho años, período durante el cual Seda Ramos extinguía condena en presidio, la única que aportó esfuerzo y trabajo fue Celestina. Al reintegrarse Seda Ramos a la comunidad, ambos trabajaban para la masa común, sin que se probase que uno aportara más que el otro. Los episodios de *delirium tremens* de los últimos años de vida de Seda Ramos, que culminaron en la declaración de su incapacidad en 1965, sugieren un menguante rendimiento de su parte, mientras que Celestina continuaba administrando el negocio de cafetín y produciendo para la comunidad. Es probable, considerados estos hechos, que la aportación total de ella superase a la de

él y por ende a la de la sociedad de gananciales participante en la comunidad.

Pero aún si considerásemos, *arguendo*, que no se probó la existencia de una comunidad de bienes, quedó establecido que ella aportó valores, esfuerzos y servicios que, a la par que coadyuvaron al mantenimiento y sustento de todos y a la educación de hijos y sobrinos, redundaron en ganancias que produjeron bienes por valor de más de $90,000. En equidad y en justicia, para evitar un enriquecimiento injusto de la sociedad de gananciales a expensas del trabajo de la demandante, tendría derecho ella a una parte de esos bienes en proporción a su aportación.

No podemos aceptar la determinación del tribunal a quo que fijó el valor de la aportación de la demandante a base de lo que los demandados le ofrecieron en transacción. Sostenerlo sería tan arbitrario como resolver que no tiene derecho a nada, o que tiene derecho a todo el capital. No hay base razonable para fijar en $15,000 la participación que en el supuesto que consideramos debía corresponder a la demandante por su trabajo, o por sus servicios. Las ofertas de transacción son inadmisibles en pleitos civiles si se objetan. *Pueblo* v. *Ruiz*, 83 D.P.R. 349, 354 (1961); *Rodríguez* v. *Great Am. Indemnity Co.*, 63 D.P.R. 605, 610 (1944); *Díaz* v. *Arroyo*, 50 D.P.R. 319 (1936). En este caso no se objetó y quedó admitida por tanto una oferta de transacción, pero su único valor probatorio es el de establecer que se hizo tal oferta por la indicada cantidad. Nada más. En ausencia de otra prueba, no puede determinarse que la cantidad ofrecida fuera el valor de lo que a la demandante debe corresponder. La función adjudicativa de un juez es indelegable. Aquí, de hecho, la cantidad que el tribunal a quo fijó la determinó la parte demandada.

Cuando la razón de pedir de la reclamante se basa en la teoría del enriquecimiento injusto y no en la existencia de una comunidad de bienes, no podría ampararse en la presun-

ción del Art. 327 del Código Civil antes transcrito. Sería obligación de ella probar con preponderancia de prueba el valor de su participación en los bienes adquiridos. No obstante, la prueba de ese hecho no tiene que ser directa, pudiendo establecerse el valor de su participación mediante inferencias razonables.

■ La demandante Celestina Caraballo, en el supuesto de que no hubiese probado la existencia de una comunidad de bienes, cumplió su obligación de probar preponderantemente que el valor de su participación es por lo menos la mitad del valor de los bienes. La demandante no tenía que probar su caso con exactitud matemática. Cf. *Martínez* v. *Martínez*, 78 D.P.R. 235 (1955); *Castro* v. *Payco, Inc.*, 75 D.P.R. 63 (1953); *Colón* v. *Shell Co.*, 55 D.P.R. 592 (1939).[5]

*Se modificará la sentencia del tribunal recurrido para declarar que la demandante Celestina Caraballo tiene derecho a una mitad de los bienes relictos al óbito de Juan Seda Ramos, así modificada, se confirmará, y se devolverán los autos a dicho tribunal para que proceda a la liquidación de la comunidad de bienes existente entre la demandante y la sociedad legal de gananciales que existió entre Juan Seda Ramos y Manuela Acosta.*

El Juez Asociado, Señor Díaz Cruz emitió opinión disidente.

—O—

Opinión disidente del Juez Asociado Señor Díaz Cruz.
San Juan, Puerto Rico, a 18 de diciembre de 1975

La opinión mayoritaria es un esfuerzo transparente por eludir el principio de que un hombre no puede generar dos sociedades de gananciales simultáneamente. *Cruz* v. *Sucn.*

---

[5] Puig Peña, en el artículo antes citado (véase el escolio 4) 33 Rev. Der. Priv., pág. 1086, señala que, "quiérase o no, al amparo y como consecuencia de esas uniones imperfectas, pueden surgir situaciones y estados

*Landrau Díaz,* 97 D.P.R. 578, 587 (1969) ; *Reyes* v. *Merlo,* 91 D.P.R. 136, 141 (1964). De un capital que la juez de instancia declaró ganancial en su totalidad, y en adición determinó ausencia total de prueba que justificara participación de la concubina en el mismo, se adjudica a ésta la mitad bajo dos premisas dispares: comunidad implícita y enriquecimiento injusto. La insignificante aportación de la concubina que no rebasa aquellas labores incidentales al maridaje, se contrapone al esfuerzo y trabajo del hombre que la juez sentenciadora describe como laborioso, mecánico diestro que trabajó de 1944–46 (dos años) en la base de Ceiba; de 1947–65 (18 años) fue empleado de conservación en el Hospital de Siquiatría donde empezó con $125 mensuales y llegó a $190. Adquirió dos guaguas dedicadas a la transportación pública que operó de 1948–65 (17 años). Al retirarse siguió haciendo trabajo de herrería en su hogar de Guaynabo y hasta que falleció a los 70 años recibía pensión de retiro del Gobierno y Seguro Social. Adquirió varias estructuras de madera que le fueron expropiadas en el año 1954 por la suma de $1,675; en el año 1951, siempre casado con Manuela, adquirió 4.311 cuerdas en Guaynabo donde edificó una casa de vivienda de hormigón, otra estructura de hormigón en que estableció el colmado-cafetín que atendía la concubina, y otra casa de madera techada de zinc. Estos inmuebles tienen un valor de $70,500 que sumados a $25,000 que acumuló en cuentas y certificados de ahorro alcanzan un total de más de $95,000 de capital relicto. Concluye la juez de instancia que "los bienes muebles e inmuebles antes descritos son propiedad de la sociedad de

---

que un sentimiento noble no rechaza y que una más justa política legislativa no puede silenciar." Al señalar la relativa imposibilidad en que se encuentra la mujer de probar su aportación, dice Puig Peña (pág. 1097): "Los Tribunales, sin embargo, han aceptado la prueba de testigos, y, desde luego han admitido que aunque no se pruebe la aportación específica de los bienes si se atestigua, en cambio, la contribución de la mujer a la prosperidad de la unión, podrá, por lo menos, reclamar una indemnización correspondiente a la retribución de su trabajo."

gananciales constituida entre don Juan Seda Ramos y doña Manuela Acosta."

Frente a esa aportación del marido, la de la concubina se describe como preparación de almuerzos y comida a los obreros que construyeron los pabellones del manicomio; crianza de animales, vacas y gallinas (sin especificar cuántos) y dos o tres cerdos que vendía; y preparación de alcapurrias y otras frituras y dulce de coco que vendía a los empleados del Hospital de Siquiatría. Abónese también a la "aportación" de la concubina que el marido le crió cuatro sobrinos, tres de ellos huérfanos.

La prueba es el cimiento de la justicia. El Art. 108 de la Ley de Evidencia (32 L.P.R.A. sec. 1971) dispone: "La parte que sostiene la afirmativa en la cuestión deberá presentar la evidencia para probarla; todo el peso de la prueba, por lo tanto, recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguno de los contendores. La prueba de una obligación corresponde a la parte que exige su cumplimiento, y la prueba de su extinción corresponde a la parte que la niega."

La ausencia de prueba fue tal en el juicio que la juez, luego de así declararlo, optó por fijar la participación de la recurrente en $15,000 tomando el número mágico de una oferta de transacción que en alguna ocasión le hicieron los herederos del marido.

Bien se acuda a la teoría de sociedad implícita o de enriquecimiento injusto el vuelo romántico y sentimental de la opinión de mayoría está refrenado por el orden jurídico erigido sobre el principio de que el peso de la prueba recae sobre el demandante que de no presentarse ninguna resultará vencido.

La opinión de la mayoría no ofrece fundamento legal para el resultado a que llega adjudicando a la concubina la mitad del capital relicto cuya naturaleza ganancial en su totalidad fue establecida por la prueba, recogida en conclusiones fácticas

que no han sido impugnadas. ¿Se ha extendido a la concubina el beneficio de una presunción que no aparece en precepto de ley alguno, o se la ha consagrado como demandante única que no tiene que probar su caso? Cuando se fuerza el Derecho en busca de una solución preferida el fantasma del mal precedente reaparecerá a atormentarnos.