Judith I. Quetglas Álvarez, demandante y recurrente, *v.* Jorge A. Carazo Castillo y Sylvia Torres López, demandados y recurridos.

*Número:* RE-89-328 *Resuelto:* 18 de noviembre de 1993

*José F. Quetglas Álvarez* y *Eric M. Quetglas Jordán*, abogados de la recurrente; *Manuel Torres Delgado*, abogado de la recurrida Sylvia Torres.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

"Al atisbar la solución, hemos de tomar los principios generales que empapan las reglas del Derecho probatorio, inspiradas en la experiencia sobre la *conducta humana, lógica y sobre todo el sentido común*, partiendo del universo mayor al de las circunstancias y contingencias particulares .... El Derecho no puede llevar a un resultado *absurdo ni a un resultado injusto* y debemos convencernos de que. cuando nos lleva a este resultado es porque hemos seguido

un camino equivocado, porque hemos errado en nuestros razonamientos." (Énfasis suplido.) J. Vallet de Goytisolo, *Panorama de Derecho Civil*, Barcelona, Ed. Bosch, 1963, pág. 86.

Adjudicar recta y justicieramente la presente controversia nos obliga a exponer cuidadosamente su trasfondo procesal y fáctico.

## I

El 28 de marzo de 1980 la Sra. Judith Quetglas Álvarez presentó en el Tribunal Superior, Sala de Bayamón, por sí y en representación de la sociedad de bienes gananciales, una demanda contra su ex esposo Dr. Jorge Carazo Castillo y la Dra. Sylvia Torres López. Aunque denominó la acción "liquidación de gananciales", pidió el reconocimiento titular de varios bienes muebles e inmuebles, su reembolso y reivindicación. Adujo que dicha sociedad tenía bienes en exceso de quinientos mil dólares ($500,000), con los cuales el doctor Carazo Castillo, a través de la doctora Torres López, adquirió los inmuebles en detrimento de dicha sociedad.[1] Reclamó, además, el costo del mobiliario de un apartamento de Garden Hills Estates y tres (3) vehículos de motor. Finalmente, solicitó el reembolso de por lo menos veinticinco mil dólares ($25,000) por los gastos de decoración y mejoras del apartamento de Garden Hills y cien mil dólares ($100,000) por los gastos de la carrera de medicina (matrícula, estudios, libros, habitación, manutención y otros gastos) de la doctora Torres López.

El doctor Carazo Castillo no contestó y se le anotó la rebeldía. Por su parte, la codemandada doctora Torres López negó las alegaciones esenciales y formuló reconvención fundamentada en que la presentación de la demanda le

---

[1] Un apartamento (piso) en Valencia, España; una casa en la Urb. Lomas Verdes, Bayamón; un apartamento en el Condominio Garden Hills Estates, Guaynabo, y una casa en la Urb. Villa Olimpia, Yauco.

había ocasionado problemas económicos y reclamó sesenta mil dólares ($60,000). La señora Quetglas Álvarez replicó y sostuvo la reconvención improcedente.

Luego de ciertos trámites procesales([2]) se celebró la vista en su fondo. Aparte de la prueba documental presentada, declararon las partes y el notario Rafael Pacheco Rivera. Pendiente de dictamen, el tribunal concluyó que era necesario incluir al Sr. Pedro Rosado, ex esposo de la doctora Torres López. Así se hizo. Emplazado por edictos, no contestó y se le anotó la rebeldía.

Subsiguientemente, el ilustrado tribunal (Hon. José F. Rodríguez Rivera, J.) declaró sin lugar la reivindicación y dispuso la liquidación de la sociedad ganancial Carazo-Quetglas. Concluyó que no se ofreció prueba documental que corroborara justo título ni el valor de sus bienes. A juicio suyo, lo único probado fue la existencia de treinta mil dólares ($30,000) gananciales que había en una caja de un banco. Los dividió y decretó un crédito a favor de la señora Quetglas Álvarez de quince mil dólares ($15,000). Desestimó la reconvención de la doctora Torres López, pero le impuso a la señora Quetglas Álvarez cinco mil dólares ($5,000) de honorarios de abogado más las costas. También le condenó a pagar mil quinientos dólares ($1,500) a favor del Estado como sanción por temeridad.

Después, mediante oportuna súplica del doctor Carazo Castillo, el tribunal enmendó su sentencia y eliminó el decreto de liquidación de la sociedad de gananciales.

A solicitud de la señora Quetglas Álvarez acordamos revisar. En síntesis, cuestiona la conclusión de que el pleito

---

([2]) El 13 de marzo de 1981, sujeto a las contingencias del proceso, se consignaron en la Secretaría del Tribunal doce mil doscientos cincuenta y un dólares con diez centavos ($12,251.10), producto de la venta ordenada por el tribunal del apartamento 10–A, Condominio Garden Hills Estates.

Luego de someter los Informes sobre Conferencia Preliminar entre Abogados, el 23 de septiembre de 1983, la doctora Torres López informó haber vendido la propiedad situada en Villa Olimpia, Yauco, por cuarenta y cuatro mil dólares ($44,000) al Sr. Ramón Concepción. Éste retuvo treinta y cinco mil dólares ($35,000) para saldar en su día una hipoteca. Ella consignó en el tribunal nueve mil dólares ($9,000).

fue colusorio, adjudicarle la titularidad de los bienes a la doctora Torres López, e imponerle honorarios, costas y la sanción.

## II

El análisis integral de la prueba testifical y documental nos convence que el ilustrado foro de instancia erró en su apreciación. En justicia, la sentencia debe revocarse ya que los hechos favorecen el reclamo de la señora Quetglas Álvarez. Expongámoslos.

La señora Quetglas Álvarez y el doctor Carazo Castillo —médico desde 1955— se casaron el 2 de diciembre de 1956. Terminó su especialidad en ginecología y obstetricia en 1959 y se ha dedicado principalmente a la práctica privada en Bayamón. Ambos procrearon tres (3) hijos, Jorge M., Edgardo L. y José A.

En 1973 el doctor Carazo Castillo conoció a la hoy doctora Torres López quien, al morir su madre, había interrumpido sus estudios de medicina en España en 1972 y se desempeñaba como asistente de sala de operaciones del Hospital Hermanos Meléndez. Durante ese año ella se casó con el señor Rosado. El doctor Carazo Castillo y la doctora Torres López iniciaron relaciones de amistad que culminaron en íntimas extramaritales. Él comenzó a ayudarla económicamente y luego, desde 1974, le sufragó sustancialmente sus estudios en la Universidad de Santiago Campeche, España, por aproximadamente un año y medio (1 1/2). Cuando terminó, regresó a mediados de 1975. El doctor Carazo Castillo declaró que durante ese período gastó aproximadamente veinticinco mil dólares ($25,000). T.E., págs. 38, 52–53 y 63–65. En Puerto Rico le costeó los cursos de repaso para la reválida, estimados por él en cinco mil dólares ($5,000) adicionales. T.E., pág. 53.

El 3 de septiembre de 1975 ella escribió la carta siguiente:

3 de septiembre del 1975
Bayamón, Puerto Rico

Yo, Sylvia Torres López, mayor de edad, natural de Yauco, residente en Bayamón; y en pleno uso de mis capacidades mentales; dejo al señor Dr. Jorge A. Carazo Castillo, como la única persona que puede cobrar mis 2 seguros de vida y además el dinero *que se ha dado* a mi hermana, Sra. Carmen P. Torres Torres, *como depósito de la compra de la casa de Lomas Verdes. Esto quiero que suceda así, en caso de mi muerte porque el Dr. Carazo fue el que me prestó el dinero para dicha compra y además el que me ha ayudado económicamente en mis últimos años de estudios*; y como es él quien conoce todas mis deudas y mis últimos deseos, estoy segura que él procederá con ese dinero hacer el buen uso y cumplir mis deseos. También quiero que conste, que él se negó a que yo preparara esta carta, pero yo he querido que sea [a] sí, por si cualquier adversidad se presentara.

Sylvia Torres López
3 de septiembre del 1975
Bayamón, P.R. (00619).
(Énfasis suplido y en el original.) Solicitud de revisión, pág. 9.

Dicha carta, según declaró el doctor Carazo Castillo, fue suscrita cuando ella iba a España, por si le ocurría algún accidente. T.E., pág. 50. La explicación es lógica. Queda corroborada por los términos del propio documento que presenta características de testamento ológrafo.[3] Su importancia adjudicativa no puede subestimarse. *Primero*, es prueba fehaciente de la profunda relación amorosa que existía entre ambos. *Segundo*, revela incontrovertidamente la ayuda financiera que le brindaba el doctor Carazo Castillo. *Tercero*, refleja verdaderamente la situación económica *limitada* de la doctora Torres López. *Cuarto*, demuestra que el doctor Carazo Castillo tenía conocimiento íntimo y exclusivo de las deudas de la doctora Torres López. Y, *finalmente*, explica las verdaderas razones de la

---

[3] Dispuso para después de su muerte bienes y derechos. Art. 616 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2121. El documento fue escrito en su totalidad, siendo ella mayor de edad. Contiene fecha exacta —día, mes y año— y está firmado. Arts. 627 y 637 del Código Civil, 31 L.P.R.A. secs. 2143 y 2161, respectivamente.

conducta del doctor Carazo Castillo —quien sabía que su divorcio era inminente— y su decisión de invertir y adquirir más inmuebles a nombre de la doctora Torres López.([4])

Se comprende, pues, que aproximadamente un (1) mes después de esa reveladora carta, compareciera la doctora Torres López representada por Awilda Flores Cancel —según poder otorgado en Valencia, España, ante el notario Don Aurelio Escribano Gonzalo, el 7 de octubre de 1975— y *haciéndose pasar por soltera*, adquiriera un apartamiento ubicado en Valencia. El doctor Carazo Castillo testificó que proveyó su pronto pago, luego se alquiló, pagándose con la renta el precio aplazado. T.E., págs. 35–36.

El 24 de octubre, esto es, al cabo de sólo diecisiete (17) días, la doctora Torres López compareció y suscribió la Escritura Núm. 91 sobre "compraventa asumiendo hipoteca" y adquirió otra propiedad inmueble ubicada en el Bloque (3–R), Urbanización Lomas Verdes, Bayamón. De nuevo, *falsamente, representó ser soltera*. En la carta de 3 de septiembre antes transcrita admitió que el depósito de la compra lo había dado el doctor Carazo Castillo. Con relación a esta segunda compra, el notario autorizante de ese instrumento, Lcdo. Rafael Pacheco Rivera, testificó que ella le informó que era soltera y que en el acto de otorgamiento estuvo presente el doctor Carazo Castillo, quien entregó en efectivo la suma de ocho mil dólares ($8,000) consignada en la escritura. T.E., págs. 16–17.

Respecto a esta compra, la doctora Torres López —el 16 de noviembre— juró y suscribió el affidávit 3289, ante el mismo notario Pacheco Rivera (Solicitud de Exoneración

---

([4]) Se expresó así:

"R. Sí, como no. Pues, este, para esa época, ya la situación en mi hogar estaba deteriorándose y ya pues, yo veía que la situación iba a terminar en divorcio y como yo era el único que trabajaba y trabajaba duro y fuerte, y me amanecía muchas noches y todo el trabajo tenía que hacerlo yo, consideré que era injusto, verdad, que todo el dinero que yo había producido y que yo a fuerza de mi sudor y mis esfuerzos, pues, fuera a perderse, no a perderse, pero a pasar, este, en el divorcio a, completamente a mi, a mi esposa, pues decidí, de común acuerdo con Sylvia Torres López comprar ciertas propiedades, que las pusiera a nombre de ella, para luego, pues yo tener esas cosas para mí, luego del divorcio." T.E., pág. 48.

Contributiva y Certificación de Posesión y Uso de Propiedad). Trazó con una raya el encasillado que pregunta el nombre del esposo o esposa del dueño, no empece dicho documento advertir que: "Declaro que la información que precede fue suministrada por mí, y a mi mejor saber y entender la misma es cierta, correcta y completa y asumo la responsabilidad penal que conlleva una declaración falsa." Solicitud de Exoneración Contributiva y Certificación de Posesión y Uso de Propiedad.

Más aún, el 12 de diciembre, siete (7) semanas después, "compró" el apartamiento 10–A del Condominio Garden Hills Estates, Guaynabo, Puerto Rico, por escritura de segregación, liberación e hipoteca, ante el notario Esteban García Malatrasi. *Volvió a comparecer como soltera.*(5) El doctor Carazo Castillo testificó que fue quien efectuó el pronto pago de siete mil seiscientos dólares ($7,600) y continuó pagando las mensualidades con dinero perteneciente a la sociedad de gananciales.

Igualmente admitió en Sala que lo amuebló y mejoró con aproximadamente siete mil dólares ($7,000), de los fondos gananciales. Aunque cuando residía allí con la doctora López Torres, el dinero para comprar estas propiedades procedió sustancialmente de unos treinta mil dólares ($30,000) que tenía en una caja en el Banco Crédito y Ahorro Ponceño. Provino también de un préstamo que efectuó sobre unas pólizas de seguro de vida con la Crown Insurance Co., que habían acumulado beneficios en exceso de treinta mil dólares ($30,000). T.E., págs. 98 y 100.

El matrimonio Carazo-Quetglas terminó por sentencia de divorcio el 30 de junio de 1977. *El doctor Carazo Castillo se casó entonces con la doctora Torres López el 3 de enero de 1978.* Vigente este nuevo matrimonio, el 10 de julio —seis (6) meses después— ella, por la Escritura Núm. 36 sobre

---

(5) También compareció como soltera cuando en esa misma fecha otorgó la Escritura de Hipoteca Núm. 607 ante el Notario Manuel Hernández Penzol por la suma de cincuenta y cinco mil dólares ($55,000)

segregación y compraventa ante el Lcdo. Ramón Malavé León, adquirió una propiedad en la Urbanización Villa Olimpia, Yauco. La hipotecó ese mismo día ante el Notario Manuel Ledesma Dávila, *manifestando nuevamente ser soltera.*

El doctor Carazo Castillo y la doctora Torres López se divorciaron a mediados de 1980; aquél se fue a residir a un pequeño apartamiento existente en el hogar de la señora Quetglas Álvarez y familia.

## III

Ante esta prueba, incidió el Tribunal Superior al resolver que el pleito era colusorio y desestimar por falta de prueba documental la demanda. El triste drama humano explica muchas cosas. Veamos.

■ Aun en una relación matrimonial normal, vigente una sociedad legal de gananciales, hemos reconocido "la laxitud y desinterés con que los cónyuges regularmente llevan a cabo las transacciones rutinarias. No se llevan libros de contabilidad, ni la ley lo exige". *García v. Montero Saldaña,* 107 D.P.R. 319, 323 (1978). Frente a esa realidad, en una relación oculta extramarital de personas casadas, ¿vamos ineludiblemente a exigir prueba directa documental consistente de pagarés, cheques, recibos y otros, para validar una acción instada por el cónyuge engañado? "Por sus características peculiares y de ordinario surgir de un trasfondo de hechos ocultos —psíquicos y generalmente ilícitos— la simulación ha sido tradicionalmente considerada como materia *difficilioris probationes* ... para probar la existencia de un acto simulado cobran valor excepcional los medios probatorios indirectos, a saber, los testigos y las presunciones." *Díaz García v. Aponte Aponte,* 125 D.P.R. 1, 11 (1989).

No podemos exigirle a la demandante Quetglas Álvarez que produjera semejante evidencia; máxime, ante prueba

de que la doctora Torres López en 1979, estando casada con el doctor Carazo Castillo, se llevó los cheques cancelados y recibos que existían. T.E., pág. 65.

La prueba testifical y documental revela un patrón de conducta y plan organizado por el doctor Carazo Castillo y la doctora Torres López para defraudar la sociedad Carazo–Quetglas, a espaldas de la señora Quetglas Álvarez. Lógicamente ambos trataron de evitar en lo posible dejar rastro o prueba alguna de sus actuaciones. Ello explica por qué se efectuaron pagos en efectivo y siempre figuraba como compareciente "soltera" la doctora Torres López. En esa época estaban tan sentimentalmente unidos que, después del divorcio del doctor Carazo Castillo, contrajeron matrimonio. El tribunal de instancia ignoró estas realidades y tachó, equivocadamente, el pleito de colusorio. ¿Cuántas controversias judiciales se resuelven y deciden diariamente en los tribunales basadas en las admisiones o producto de las confesiones de uno de los coautores o participantes, sin cuyos testimonios se burlarían los mejores fines de la justicia? El hecho de que el proceder de alguno de los protagonistas estuviera matizado de interés personal o de una actitud de arrepentimiento o venganza, no destruye su valor probatorio; máxime, como aquí, que quedó demostrado por prueba documental cuya legitimidad no está en entredicho.

Cualesquiera dudas quedan disipadas al observar que el testimonio del doctor Carazo Castillo, en los extremos esenciales, fue confirmado por la propia doctora Torres López. Revela, además, que ella estudió con mucho esfuerzo y grandes limitaciones económicas. De hecho, mientras trabajó no rindió las planillas de contribución sobre ingresos de 1973 y 1974, aun cuando devengó "sobre $1,000.00" mensuales. T.E., págs. 147–148. En cuanto a sus estudios en España, las becas que recibió fueron de sólo mil dólares ($1,000) anuales para los años 1969 al 1972 (T.E., pág. 114), época *antes* de aflorar la amistad

íntima con el doctor Carazo Castillo. Con renuencia admitió que él le "ayudaba a sus estudios ... o sea [le] hacía regalos ..." (T.E., pág. 169); que le ayudó y regaló los cursos de reválida (T.E., pág. 175); que le prestó el dinero para la casa de Bayamón (T.E., págs. 167–168), y que le "regaló" el dinero del pronto del apartamento en Garden Hills Estates (T.E., págs. 179–176).

En contraste, la prueba ofrecida por la doctora Torres López para avalar sus argumentos de que estudió medicina con el producto de giros remitidos por su hermana dista mucho de establecer que se utilizaron para comprar las propiedades. Recuérdese que regresó a Puerto Rico al morir su madre, tuvo que trabajar y allí conoció al doctor Carazo Castillo, cuyo amor le llevó a sufragar los gastos para que ella pudiera terminar. El doctor Carazo Castillo decidió comprar las propiedades inmuebles, con dineros de la sociedad de gananciales Carazo-Quetglas para luego divorciarse, lo cual él entendía era inevitable. De ese modo, pasaría a ser su único dueño.

Se trata, pues, de un esquema diseñado con el propósito de defraudar a la sociedad legal de gananciales Carazo-Quetglas. Este tipo de ánimo fraudulento puede concretarse de formas diversas, tales como préstamos a espaldas del cónyuge o, como la que nos ocupa, en forma de adquisición de inmuebles mediante el uso de testaferros. Independientemente del método utilizado, la norma reiterada por este tribunal para atender estas situaciones es clara; los actos de disposición o administración que cualquiera de los cónyuges haga sobre bienes gananciales *no perjudicarán* al otro cónyuge ni a sus herederos, si ellos no sirven a un interés de la familia o se hacen con el ánimo fraudulento u oculto de perjudicar al otro cónyuge.[6] Nada impide, sin embargo, que cualesquiera beneficios económicos

---

[6] Véanse: *WRC Props., Inc. v. Santana,* 116 D.P.R. 127, 135 (1985); *Banco de Ahorro del Oeste v. Santos,* 112 D.P.R. 70, 76–77 (1982), y el Art. 1313 del Código Civil, 31 L.P.R.A. sec. 3672.

a que el cónyuge tenga derecho en virtud de estas actuaciones sea ganancial.([7])

Estamos entonces ante unas adquisiciones simuladas como señaláramos, efectuadas con el sólo propósito de defraudar a la sociedad legal de gananciales Carazo-Quetglas. No cabe duda que él, en combinación y con el conocimiento de la doctora Torres López, dispuso indebidamente de dinero ganancial. En nada puede perjudicar los derechos de la señora Quetglas Álvarez y sus hijos, el que estuviesen a nombre de la doctora Torres López.

 Con relación a los efectos jurídicos de una simulación contractual de esta naturaleza, en *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13, 19–20 (1962), resolvimos lo siguiente:

> La simulación puede afectar la naturaleza, el contenido o los sujetos del contrato. Para los fines del presente caso sólo nos interesa la que se refiere a los sujetos del contrato, y que se manifiesta mediante la interposición de persona. Dejemos que Ferrara fije los límites de esta figura jurídica:
>
> "Al celebrarse un negocio jurídico, cabe que se interponga una persona extraña con el fin de ocultar al verdadero interesado. Esta persona sirve de intermediario, de eslabón entre los que quieren conseguir los efectos de un acto jurídico. Los caracteres que la distinguen, en general son: 1[ro.] Ponerse entre dos que deben ligarse directamente en el negocio, o entre los cuales debe descansar en definitiva el contenido patrimonial del mismo, sin que el intermediario tenga en el negocio un interés personal. 2[do.] Su función de ocultar al verdadero dueño del negocio, que quiere permanecer entre bastidores."
>
> Acto seguido procede el eminente civilista italiano a considerar la división de las personas interpuestas en dos grandes categorías, a saber: personas interpuestas reales y personas interpuestas simuladas. El primero interviene en el contrato "como contratante efectivo —entablando la relación jurídica en

---

([7]) En lo pertinente, el Art. 1313 del Código Civil, *supra*, dispone:

"Todo acto de disposición o administración que sobre dichos bienes haga cualquiera de los cónyuges en contravención a esta sección, y los demás dispuestos en este título, *no perjudicará* al otro cónyuge ni a sus herederos." (Énfasis suplido.)

Tal disposición consigna que la sociedad no se perjudicará de tales actos. Como expuso, no opta, sin embargo, que la sociedad se beneficie, si ese fuera el caso.

su propio nombre y convirtiéndose de este modo en titular de los derechos y obligaciones que derivan de la misma para inmediatamente volverlos a transferir al dueño del negocio, que ha mantenido apartado de éste—" (pág. 273); el segundo, interviene "por mera apariencia, como contratante ficticio, cuando en realidad la relación se establece entre el tercero y el interesado, que no comparece en el contrato," (id.) y que se denomina indistintamente intermediario fingido, testaferro o prestanombre. (Véase, además, Bonet Ramón, *Algunas Figuras Afines al Contrato de Mandato*, Revista General de Legislación y Jurisprudencia[,] (1948) tomo 184, pág. 633, 648–651.) Y añade:

"Señalando brevemente el concepto de la interposición ficticia, examinemos sus requisitos. Para la formación del negocio sólo se necesita la intervención jurídica de dos personas: los verdaderos contratantes, uno de los cuales obra con nombre supuesto. La persona interpuesta es extraña a la relación, y, descubierta la simulación, se evapora por completo. Cuando más, dicha persona presta una simple cooperación material, que puede consistir en la mera comparecencia personal como parte de contrato para perfeccionar la *mise en scene* y repetir mecánicamente la declaración que se le dicta al oído. Por ello, los vicios del consentimiento, la capacidad, etc., han de apreciarse en el contratante secreto, y no en la persona interpuesta." (Pág. 281.)

Parece claro de lo expuesto que la relación se crea directamente entre el contratante visible y el contratante oculto, cuyo patrimonio es el que recibe los efectos del contrato. El intermediario es un extraño al vínculo engendrado en virtud de la relación contractual; de ahí, que podamos hacer abstracción de su presencia a los fines de determinar los efectos jurídicos de la transacción. (Escolio omitido.)

Las compraventas relacionadas con los inmuebles antes mencionados son transacciones legítimas en las cuales la verdadera parte adquirente fue dicha sociedad, la cual estuvo representada por un intermediario o prestanombre, cuya interposición, como hemos dicho, "se esfumó" al considerarse la transacción en conjunto.

Excepto el inmueble en Villa Olimpia, Yauco, los demás fueron adquiridos casado el doctor Carazo Castillo con la señora Álvarez Quetglas, y la doctora Torres López con el Sr. Pedro Rosado. Nada surgió de la prueba ofrecida que estableciera o pudiera considerarse una comunidad de bie-

nes entre dos (2) sociedades gananciales diferentes. T.E., págs. 180–181.

■ Para establecer una comunidad de bienes es necesario demostrar que hay bienes obtenidos por esfuerzo, trabajo y cooperación común, que trae como consecuencia un aumento en el caudal. Véanse: *Cruz v. Sucn. Landrau Díaz*, 97 D.P.R. 578, 585 (1969); *Danz v. Suau*, 82 D.P.R. 609 (1961).

Las inversiones y adquisiciones efectuadas del doctor Carazo Castillo —verdadero contratante y a la sazón casado con la señora Quetglas Álvarez— aun cuando fueron hechas a nombre de la doctora Torres López, se reputan gananciales. Art. 1307 del Código Civil, 31 L.P.R.A. sec. 3647. *García v. Montero Saldaña*, supra.

■ Disuelta la sociedad de gananciales Carazo-Quetglas por el divorcio, la situación jurídica resultante se rige por los preceptos de la comunidad de bienes ordinaria, que en lo concerniente a su liquidación en *Rosa Resto v. Rodríguez Solís*, 111 D.P.R. 89, 91–92 (1981), dispusimos:

La liquidación de la sociedad de gananciales comprende todas las operaciones necesarias para determinar la existencia de gananciales y en caso afirmativo su división por partes iguales entre ambos cónyuges, o sus sucesiones en interés. A esta cantidad o valor final a ser dividido por mitad, se llega previas deducciones y reintegros a cada uno de aquellos bienes que le corresponden a título privativo, así como de las responsabilidades imputables al acervo común. Dicha liquidación puede resumirse en tres operaciones: 1 formación de inventario con avalúo y tasación; 2 determinación del haber social o balance líquido a partir; y 3 división y adjudicación de los gananciales. *Janer Vilá v. Tribunal Superior*, 90 D.P.R. 281 (1964). El inventario es la base de todo el proceso y se le define como "relación detallada del activo (bienes y derechos) pasivo (obligaciones y cargas) de la comunidad en el momento de su disolución, acompañada de su tasación". Ordena el Art. 1317 del Código Civil, 31 L.P.R.A. sec. 3692:

El inventario comprenderá numéricamente, para colacionarlas, *las cantidades que, habiendo sido pagadas por la socie-*

*dad de gananciales*, deban rebajarse del capital del marido o de la mujer.

También se traerá a colación el importe de las donaciones o enajenaciones que deban considerarse ilegales o fraudulentas, con sujeción a la sec. 3672 de este título....

Forman parte del activo a ser inventariado, no sólo los bienes y derechos en poder de la comunidad conyugal al momento de su disolución, sino que también han de ser incluidas en inventario y traídas a colación todas las cantidades que habiendo sido pagadas por la sociedad de gananciales, deban rebajarse del capital de marido o de la mujer. (Escolios omitidos.)

Por lo tanto, reconocemos el derecho de propiedad de la antigua sociedad legal de gananciales, hoy comunidad de bienes Carazo-Quetglas, sobre los inmuebles siguientes:[8] el apartamento localizado en Valencia, España; la casa ubicada en la Urbanización Lomas Verdes de Bayamón, y el apartamento en el Condominio Garden Hills Estates.[9]

Conforme expresamos, quedó establecido que el doctor Carazo invirtió por lo menos veinticinco mil dólares ($25,000) en los estudios de medicina de la Dra. Sylvia Torres en España, cinco mil dólares ($5,000) durante sus estudios de preparación para la reválida local y siete mil dólares ($7,000) para amueblar y mejorar el apartamento de Guaynabo. A tenor con lo dispuesto en el Art. 1316 del Código Civil, estas sumas serán colacionadas al hacerse el inventario de los bienes pertinentes a la liquidación oportuna de la sociedad legal de gananciales Carazo-Quetglas, para hacer la rebaja adecuada del capital del doctor Carazo conforme a dicha disposición legal.

*Se dictará sentencia revocatoria y se devolverán los autos originales para los trámites compatibles.*

---

[8] La propiedad localizada en el Municipio de Yauco fue adquirida vigente el matrimonio Carazo-Martínez. No se aportó suficiente evidencia para derrotar la presunción de ganancialidad que le asiste.

[9] En cuanto al apartamento localizado en el Condominio Garden Hills Estates, fue vendido y el importe resultante de la venta se consignó en el tribunal.

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso concurrieron con el resultado sin opinión escrita. El Juez Asociado Señor Rebollo Lopéz no intervino.