ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| ELBA RUSSE RODRÍGUEZ<br><br>Parte Recurrida<br><br><br>v.<br><br><br>ALFREDO BEAUCHAMP DÍAZ y su tutor ALFREDO BEAUCHAMP SIERRA Y MARÍA SIERRA RODRÍGUEZ<br><br>Parte Peticionaria | TA2025CE00956 | *Certiorari,* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.:<br>D AC2005-1145<br><br>Sala: 504<br><br>Sobre:<br>División de Comunidad |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Monge Gómez, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de enero de 2026.

Compareció ante este Tribunal la parte peticionaria, el Sr. Alfredo Beauchamp Sierra, la Sra. Awilda Beauchamp Sierra, el Sr. Iván Beauchamp Sierra, como miembros de la Sucesión de Alfredo Beuchamp Sierra (en adelante, "Sucesión Beauchamp" o "Peticionarios"), mediante recurso de *Certiorari* presentado el 28 de diciembre de 2025. Nos solicitó la revocación de la *Orden* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante, "TPI"), el 24 de noviembre de 2025 y notificada al día siguiente. A través del aludido dictamen, el TPI acogió y aprobó el "**Quinto Informe Enmendado**" en el cual se recomendó realizar la división y adjudicación de la comunidad de bienes habida entre las partes.

Por los fundamentos que expondremos a continuación, se *expide* el auto de *certiorari* y se *revoca* la *Orden* recurrida.

**I.**

El caso de autos se remonta al 28 de mayo de 2004, cuando la Sra. Elba Russe Rodríguez (en adelante, la "señora Russe Rodríguez" o "Recurrida") presentó una "**Demanda**" sobre división de comunidad contra el Sr. Alfredo Beauchamp Díaz (en adelante, señor Beauchamp Díaz), su esposa, la Sra. María Sierra Rodríguez y su tutor, el Sr. Alfredo Beauchamp Sierra. Alegó que sostuvo una relación de concubinato por veintitrés (23) años con el señor Beauchamp Díaz. Explicó que, durante la vigencia de su relación, mantuvieron sus bienes en comunidad y acordaron vivir como marido y mujer. Siendo así, adquirieron los siguientes bienes en conjunto: (1) Finca de 250 cuerdas ubicada el Barrio Pugnado de Vega Baja; (2) Vaquería conocida como "Dorín", ubicada en el Municipio de Morovis; (3) finca de 67.23 cuerdas, ubicada en el mismo ayuntamiento; (4) terreno localizado en el Barrio Franquez, también del Municipio de Morovis; (5) vehículo de motor, modelo Pathfinder del año 2001; y (6) Finca Lomba ubicada en el Municipio de Vega Baja. La señora Russe Rodríguez solicitó la división de los bienes dado a que no deseaba continuar en comunidad.

Luego de varias instancias procesales, el 7 de octubre de 2008, el TPI dictó una *Sentencia* en la cual le reconoció a la Recurrida la participación del cincuenta por ciento (50%) en las siguientes propiedades:

> a. Finca de 250 cuerdas, en el Barrio Pugnado Adentro de Vega Baja – Valor: $775,000.00. La cual se adquirió el 9 de diciembre de 1983 por $383,000.
>
> b. Finca y Vaquería conocida como "Dorín", ubicada en la Carr. 633, Bo. Barahona de Morovis – Valor: $675,000.00, adquirida el 26 de febrero de 1987 por $193,280.65.
>
> c. Finca en el Barrio Franquez de Morovis – Valor: $225,000.00.
>
> d. Finca Lomba, Barrio Quebrada y Río Arriba – Valor: $700,000.00, la cual se adquirió el 5 de agosto de 1982 por $150,000.00.[1]

Tras la adjudicación de un crédito de cuarenta y dos mil ciento sesenta y tres dólares con ochenta y dos centavos ($42,163.82) a favor a la

---

[1] Mediante una Sentencia *Nunc Pro Tunc*, emitida el 24 de noviembre de 2025, el foro primario enmendó la descripción como sigue: "Finca Lomba (A y B), Barrio Quebrada Arenas y Río Arriba Valor de Lomba A es $700,000.00. Según surge del Exhibit 13 y el valor de Lomba B es $45,000.00. Se adquirió el 5 de agosto de 1982 por $150,000".

Sociedad Legal de Gananciales compuesta entre el señor Beauchamp Díaz y su esposa, el foro de instancia estableció que el valor del caudal de la comunidad ascendía a dos millones trescientos treinta y dos mil ochocientos treinta y seis dólares con dieciocho centavos ($2,332,836.18). Por consiguiente, se determinó que la participación de la señora Russe Rodríguez debía ser un millón cuatrocientos treinta y ocho mil novecientos dieciocho dólares con nueve centavos ($1,438,918.09).

Posteriormente, el TPI designó como contador partidor al Lcdo. Carlos Dávila Vélez (en adelante, "licenciado Dávila Vélez" o "contador partidor"). En lo pertinente, el 18 de agosto de 2025, el licenciado Dávila Vélez presentó un documento que intituló "**Quinto Informe**", con el propósito de formalizar el cuaderno particional y adjudicar la participación de la señora Russé Rodríguez y de los Peticionarios. A base de las tasaciones de los bienes inmuebles en controversia, el licenciado Dávila Vélez efectuó su recomendación al foro recurrido.

De conformidad con la misma, promovió para que se le adjudicara a la Recurrida la Finca sita en el Barrio Pugnado Adentro, con un valor neto de $950,000.00 y los solares 1, 2, 4, 5, 6, 7, 8, 9 y 11 de la finca Lomba B, con un valor neto de $277,915.80. Así pues, concluyó que la señora Russé Rodríguez debía recibir bienes inmuebles valorados en $1,277,915.80. En lo que respecta a los Peticionarios, recomendó el Contador Partidor que se les adjudicaran los solares 1, 11, 13, 14, 16, 17, 18, 19, 23, 24, 25, 26, 27 y 28 de la finca Lomba A, con un valor neto de $543,452.52; el solar 10 de la finca Lomba B con un valor neto de $34,854.48, la finca Dorín con un valor neto de $464,587.37 y la finca Franquez con un valor neto de $209,575.38, para un total global de $1,252,469.75. Igualmente, el licenciado Dávila Vélez recomendó que cada parte se hiciera cargo del pago de las contribuciones sobre la propiedad adeudadas al presente en cada inmueble, así como del trámite y costo para inscribir los mismos en el Registro de la Propiedad y en el Centro de Recaudaciones Municipales (en adelante, "CRIM").

Posteriormente, el 20 de agosto de 2025, el foro recurrido acogió las recomendaciones del informe. Además, le otorgó un término a la Sucesión Beauchamp para que presentara su postura.

Conforme a lo ordenado, el 9 de septiembre de 2025, el Peticionario Alfredo Beauchamp Sierra presentó su "**Oposición a Quinto Informe**". Señaló que el contador partidor les asignó alrededor del noventa y cuatro por ciento (94%) de la totalidad de la deuda del CRIM. Es decir, la señora Russe Rodríguez asumiría una deuda estimada de veintiún mil ochocientos ochenta y cuatro dólares con setenta y dos centavos ($21,884.72), mientras que la deuda de la Sucesión Beauchamp ascendía a trescientos once mil ochocientos sesenta y cuatro dólares con diez centavos ($311,864.10). asimismo, argumentó que la distribución de las deudas fue injusta.

En esa misma fecha, se presentó una "**Moción Sometiendo Posición en cuanto al Quinto Informe del Contador Partidor y Solicitando Enmiendas**". En ésta, los peticionarios Iván Beauchamp Sierra y Awilda Beauchamp Sierra detallaron la omisión de una información referente a la finca Franquez y la finca Lomba A. Por otro lado, añadieron que el informe tampoco hizo mención alguna de las hipotecas que gravan la Vaquería Dorín. Especificaron que, a pesar de que esta deuda fue condonada por legislación federal, no se habían presentado los pagarés de cancelación ante el Registro de la Propiedad. A base de lo anterior, detallaron que los honorarios y aranceles debían ser satisfechos por las partes, toda vez que se trataba de un gasto atribuible a la comunidad de bienes.

El 18 de septiembre de 2025, la Sra. Russe Rodríguez presentó su "**Réplica a Oposición a Quinto Informe (Lcdo. André Díaz)**", en el que explicó que los reclamos de la Sucesión Beauchamp no contenían fundamento alguno y se basaron en que el informe les resultaba injusto. Reveló que, en 2014, debido a una amnistía contributiva, los Peticionarios pagaron las deudas del CRIM de todas las propiedades, incluso de otras propiedades que no pertenecían a este caso. Sobre la Vaquería Dorín,

indicó que los Peticionarios no pudieron pagar la deuda dado a que *Farmers Home* se proponía a iniciar un procedimiento de ejecución de hipoteca.

A raíz de lo anteriormente descrito, el contador partidor emitió su "**Quinto Informe Enmendado**" de fecha del 14 de noviembre de 2025. A pesar de haber corregido la información omitida, no dispuso sobre los gastos de cancelación de hipoteca sobre la Vaquería Dorín. Mantuvo la adjudicación de las fincas de la forma propuesta inicialmente y recomendó que cada parte se hiciera responsable de las deudas contributivas sobre las propiedades correspondientes. De igual manera, cada parte se debía encargar de realizar los trámites y procedimientos de inscripción de su título en el Registro de la Propiedad.

Seguidamente, el 24 de noviembre de 2025, el TPI emitió la *Orden* recurrida, en el cual acogió las divisiones y adjudicaciones establecidas en el "**Quinto Informe Enmendado**".

Inconforme, el 28 de diciembre de 2025, los Peticionarios comparecieron mediante el recurso de epígrafe, en el que señalaron la comisión del siguiente error:

> Incidió el Tribunal de Primera Instancia al acoger y aprobar el Quinto Informe Enmendado del Contador Partidor en cuanto a la adjudicación de los bienes de la comunidad, a pesar de que no se observaron las normas que rigen la liquidación de una comunidad y, en particular, nada se dispuso sobre los gastos de aranceles y honorarios notariales para la cancelación de unas hipotecas que gravan una de las propiedades adjudicadas a los peticionarios, gasto que corresponde a la comunidad de bienes, y, además, se les impuso el pago de la cantidad de $316,873.39 correspondiente a las contribuciones territoriales acumuladas y vencidas de las fincas, que incluye una partida de $5,009.29 adicionales de contribuciones estimadas. Sin embargo, a la recurrida se le impuso el pago de tan solo $19,444.20 de contribuciones territoriales estimadas no impuestas por el Centro de Recaudaciones de Ingresos Municipales lo que implica que la adjudicación no se realizó conforme a las normas de participación en las cargas en las proporciones que correspondan a los comuneros.

El 13 de enero de 2026, emitimos *Resolución* mediante la cual le concedimos a la parte recurrida un término para presentar su alegato en oposición. Tras una solicitud de prórroga para cumplir con lo ordenado, el 14 de enero del mismo año, le concedimos a dicha parte recurrida un plazo final para presentar su alegato en oposición.

El 26 de enero de 2026, la parte recurrida cargó al expediente electrónico un documento que identifico como su oposición. Sin embargo, al examinar dicho documento, nos percatamos de que el mismo no constituía la aludida oposición, sino más bien, una moción que se presentó ante el TPI. En vista de lo anterior, ese mismo día, emitimos una tercera *Resolución* en la cual le advertimos a la parte recurrida de dicho error y/o inadvertencia. Allí, le señalamos dicha circunstancia y le apercibimos de que debía cumplir con presentar propiamente su oposición dentro del término final concedido que vencía el 26 de enero de 2026.

Al día de hoy, la parte recurrida no ha cumplido ni ha solicitado prórroga a esos efectos. Conforme a lo anterior y habiéndole advertido sobre las consecuencias de su incumplimiento, resolvemos sin el beneficio de su comparecencia.

**II.**

**A.**

El auto de *certiorari* es el recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar, a su discreción, una decisión de un tribunal inferior. McNeil Healthcare v. Mun. Las Piedras I, 206 DPR 391, 403 (2021). "[L]a característica distintiva de este recurso se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos". Rivera *et al.* v. Arcos Dorados *et al.*, 212 DPR 194, 209 (2023). Con el fin de que podamos ejercer de una manera sensata nuestra facultad discrecional de entender o no en los méritos de los asuntos que son planteados mediante el recurso, la Regla 40 de nuestro Reglamento, 4 LPRA Ap. XXII-B, señala los criterios que debemos considerar al atender una solicitud de expedición de un auto de *certiorari*. BPPR v. SLG Gómez-López, 213 DPR 314, 336 (2023). En lo pertinente, la precitada disposición reglamentaria establece lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari*, o de una orden de mostrar causa:
>
> > A. Si el remedio y la disposición de la decisión recurrida a diferencia de sus fundamentos son contrarios a derecho.

> B. Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> F. Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, *supra.*

Dentro de este marco, el análisis del foro apelativo intermedio -al momento de considerar los asuntos planteados mediante el recurso de *certiorari*- no se efectúa en el vacío ni se aparta de otros parámetros. Rivera *et al.* v. Arcos Dorados *et al.*, *supra*, pág. 209; 800 Ponce de León v. AIG, 205 DPR 163, 176 (2020). Las delimitaciones que imponen estas disposiciones reglamentarias tienen como objetivo intrínseco prevenir la "dilación que causaría la revisión judicial de controversias que pueden esperar a ser planteadas a través del recurso de apelación". Mun. Caguas v. JRO Construction, Inc.*,* 201 DPR 703, 712 (2019). Nótese que, distinto al recurso de apelación, el auto de *certiorari*, por ser un recurso discrecional, debe ser utilizado con cautela y por razones de peso. Pueblo v. Díaz de León, 176 DPR 913, 918 (2009).

En ese sentido, el Tribunal Supremo de Puerto Rico reiteradamente ha indicado que la discreción significa tener poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción. García v. Padró, 165 DPR 324, 334 (2005). El adecuado ejercicio de la discreción judicial está "inexorable e indefectiblemente atado al concepto de la razonabilidad". Pueblo v. Ortega Santiago, 125 DPR 203, 211 (1990). Así pues, un tribunal apelativo no intervendrá con las determinaciones discrecionales de un tribunal sentenciador, a no ser que las decisiones emitidas por este último sean arbitrarias o en abuso de su discreción. S.L.G. Flores-Jiménez v. Colberg, 173 DPR 843, 865 (2008).

**B.**

Nuestro ordenamiento establece la figura del concubinato como la relación entre un hombre y una mujer solteros que viven como casados sin estarlo. Caraballo Ramírez v. Acosta, 104 DPR 474, 476, esc. 1 (1975). De modo que, distinto al matrimonio, el concubinato no genera un régimen económico automáticamente, por lo que no presume la existencia de una comunidad de bienes entre los concubinos y ésta deberá ser probada por el concubino que plantea su existencia. R. Ortega Vélez, Compendio de Derecho de Familia, San Juan, Pubs. JTS, 2000, T. II, pág. 619

El Tribunal Supremo ha reconocido que una concubina o un concubino posee un interés propietario en aquellos bienes adquiridos o en el aumento en valor de esos bienes durante la relación concubinaria "como resultado del esfuerzo, labor y trabajo aportados conjuntamente bajo cualesquiera de las siguientes alternativas: (1) como pacto expreso; (2) como pacto implícito que se desprende espontáneamente de la relación humana y económica existente entre las partes durante el concubinato; y (3) como un acto justiciero para evitar el enriquecimiento injusto". Domínguez Maldonado v. E.L.A., 137 DPR 954, 967 (1995). La aportación de bienes o de esfuerzo constituyen una comunidad de bienes, por lo que nuestro ordenamiento le ha reconocido a un concubino o una concubina el derecho de instar una acción de disolución y liquidación de comunidad de bienes. Rodríguez Rodríguez v. Moreno Rodríguez, 135 DPR 623, 628-629 (1994). Sin embargo, aquel que promueva la acción es responsable de "probar que se aportó esfuerzo y trabajo para producir o aumentar el capital objeto de la reclamación". Domínguez Maldonado v. E.L.A., *supra*, págs. 967-968.

Aclarado que entre concubinos se reconoce la existencia de una comunidad de bienes, si así se prueba, debemos entrar a las disposiciones que rigen lo pertinente a esta forma de co-propiedad.

**C.**[2]

---

[2] Somos conscientes que el Código Civil de 1930 fue derogado por la Ley Núm. 55-2020, según enmendada, conocida como "Código Civil de 2020", 31 LPRA secs. 5311 *et seq.* No obstante, el Artículo 1808 de esta última pieza legislativa establece que "[l]as acciones y los derechos nacidos y no ejercitados antes de la entrada en vigor de este Código, subsisten con la extensión y en los términos que le reconoce la legislación precedente; pero sujetándose, en cuanto a su ejercicio y procedimientos para hacerlos valer, a lo dispuesto

Existe una comunidad de bienes "cuando la propiedad de una cosa o de un derecho pertenece de modo pro indiviso a varias personas". Art. 326 del Código Civil, 31 LPRA sec. 1271. No obstante, apunta el profesor Vélez Torres que el concepto de la "comunidad" se refiere a la titularidad conjunta de cualquier derecho, mientras que la "copropiedad" es la titularidad conjunta sobre un derecho de propiedad. J. R. Vélez Torres, Curso de Derecho Civil, 2005, T. II, pág. 144. En nuestro ordenamiento jurídico se presume que dichas cuotas son iguales y que la participación de los comuneros será proporcional, tanto en los beneficios como en las cargas, a menos que se pruebe lo contrario. Art. 327 del Código Civil, 31 LPRA sec. 1272. Se ha establecido que la división de la cosa común puede tener lugar en cualquier momento a petición de cualquiera de los comuneros, ya que ninguno de éstos está obligado a permanecer en la comunidad. Art. 334 del Código Civil, 31 LPRA sec. 1279.

Nuestro máximo foro judicial ha establecido que no es hasta la liquidación de la comunidad, proceso que exige la formación de un inventario, el avalúo y tasación de los bienes, así como el pago de deudas, cargas y obligaciones de la comunidad, que se puede afirmar la existencia de un sobrante o ganancia para ser dividido y adjudicado entre los comuneros. García v. Méndez García, 102 DPR 383, 395 (1974). Al dividirse una comunidad de bienes, se estará a lo dispuesto sobre la división de herencia. Art. 340 del Código Civil, 31 LPRA sec. 1285.

En lo pertinente a nuestra controversia, para que una partición sea viable, es menester llevar a cabo varias operaciones previas. Estas operaciones particionales son: inventario y avalúo, liquidación, división, formación de lotes o hijuelas y la adjudicación. J.R. Vélez Torres, Curso de Derecho Civil: Derecho de Sucesiones, 2da ed., San Juan, Universidad Interamericana de Puerto Rico, 1997, Tomo IV, Vol. III, pág. 523.

---

en este Código. Si el ejercicio del derecho o de la acción se halla pendiente de procedimientos comenzados bajo la legislación anterior, y estos son diferentes de los establecidos en este Código, pueden optar los interesados por unos o por otros". 31 LPRA sec. 11713. En ausencia de una determinación expresa de las partes sobre cuáles normas serían utilizadas, y dado al hecho de que los fundamentos traídos ante nuestra consideración están fundamentados en el derogado Código Civil de 1930, utilizares las disposiciones del mismo para propósitos de adjudicar el presente recurso.

Inicialmente, se requiere llevar a cabo un inventario, es decir, "la relación detallada del activo (bienes y derechos) y pasivo (obligaciones y cargas) de la comunidad en el momento de su disolución, acompañada de su tasación". Montalván v. Rodríguez, 161 DPR 411, 457 (2004); Quetglas v. Carazo, 134 DPR 644, 657 (1993). Seguidamente, procede llevar a cabo un avalúo o tasación de los bienes. Montalván v. Rodríguez, *supra,* págs. 457-458. Únicamente después de haberse pagado las deudas, cargas y obligaciones de la comunidad de bienes, podrá tener lugar la liquidación; esto es, la repartición a los comuneros, en partes iguales, del remanente de la comunidad de bienes. Island Holdings v. Sucn. Hernández Ramírez, 201 DPR 1026, 1037 (2019); Montalván v. Rodríguez, *supra,* pág. 458. Por último, corresponde realizar la adjudicación, que "es el hecho de entregar a cada comunero lo que le corresponde con exclusión de los demás". Matos Rivera v. Soler Ortiz, 213 DPR 1044, 1061 (2024).

Por ende, resulta meritorio puntualizar que, en toda acción judicial de partición de comunidad de bienes, es necesario realizar estas operaciones particionales, toda vez que su omisión afecta la resolución del pleito. Ello permite que el foro adjudicador tenga ante sí todos los elementos que le permitan determinar el valor de la participación de cada comunero y completar la partición. Íd.

**III.**

En el presente caso, los Peticionarios solicitaron la revocación de la *Orden* del TPI mediante la cual aprobó el "**Quinto Informe Enmendado**". Alegaron que, según el aludido informe, el contador partidor dividió y adjudicó la comunidad de bienes previo al pago de las deudas del CRIM. En virtud de la recomendación, cada parte sería responsable del pago de contribuciones de la propiedad correspondientes a cada inmueble sujeto a división. Igualmente, la Sucesión Beauchamp arguyó que el foro de instancia tampoco dispuso sobre los honorarios notariales referentes a las cancelaciones de hipoteca que gravan la Vaquería Dorín.

Conforme a la normativa antes expuesta, en toda acción judicial de partición de una comunidad de bienes, es necesario realizar las operaciones

particionales previas para así poder lograr el ejercicio final de adjudicación. De modo que el foro adjudicador tenga todos los elementos que le permitan determinar el valor de la participación correspondiente a cada comunero. Matos Rivera v. Soler Ortiz, *supra.* Según establecido en la jurisprudencia, para liquidar la comunidad de bienes, es necesario realizar el inventario, avalúo, tasación, el pago de las deudas, cargas y obligaciones. Únicamente después de realizar el pago de las deudas, cargas y obligaciones de la comunidad de bienes, tendrá lugar la liquidación de la misma. Island Holdings v. Sucn. Hernández Ramírez,, *supra*.

Como detallamos en el tracto procesal, el foro primario emitió una *Sentencia Nunc Pro Tunc* en la que determinó que la Recurrida posee un cincuenta por ciento (50%) de la participación de los bienes de la comunidad. Luego, le ordenó al contador partidor a que realizara las operaciones particionales pertinentes. Surge que, en el último informe presentado por el licenciado Dávila Vélez, se recomendó que cada parte asumiera la responsabilidad de cubrir las deudas contributivas y de la inscripción de titularidad ante el Registro de la Propiedad. Es decir, las deudas del CRIM debían ser asumidas conforme a la propiedad que le fuera adjudicada a cada parte. Siendo así, la deuda de la Sucesión Beauchamp ascendía a trescientos once mil ochocientos sesenta y cuatro dólares con diez centavos ($311,864.10), mientras que la de la señora Russé Rodríguez se estimaba en veintiún mil ochocientos ochenta y cuatro dólares con setenta y dos centavos ($21,884.72).

Coincidimos con lo planteado por los Peticionarios, respecto a que en este caso procede ordenar el pago de las deudas contributivas previo a la liquidación y adjudicación de la comunidad de bienes. Es decir, es indiscutible que las contribuciones sobre la propiedad adeudadas en cada uno de los bienes inmuebles deben formar parte de las operaciones particionales antes de adjudicar ningún bien pro indiviso. Ello puesto que es solo luego de haberse pagado las deudas, cargas y obligaciones de la comunidad de bienes que se puede proceder con la liquidación y la repartición de éstos a los comuneros. Island Holdings v. Sucn. Hernández

Ramírez, *supra*, pág. 1037. No existe controversia sobre la existencia de la deuda del CRIM que tiene cada una de las propiedades. Por tanto, antes de proceder con la adjudicación de los aludidos inmuebles, procedía que se pagaran las deudas por dicho concepto para cada una de las propiedades sujetas a división, de conformidad con nuestro estado de derecho. Solo así se podrá continuar con las fases finales de las operaciones particionales de la comunidad de bienes habida entre las partes de epígrafe.

De otro lado, la Sucesión Beauchamp sostiene que procede imputar como pasivos de las operaciones particionales los gastos relacionados a las honorarios y aranceles y gastos notariales de la cancelación de unas hipotecas que gravaban la finca Dorín y que, como parte de una legislación federal, la deuda garantizada fue condonada. Según se alegó en el escrito ante nos, el 26 de junio de 2024, el TPI emitió una *Orden* dirigida a *Farm Service Agency* para que sometiera información referente a las hipotecas que gravaban la Vaquería Dorín. Se desprende que el 15 de julio de 2024, el director de la Oficina de Préstamos informó que el balance de esta obligación se saldó por medio del *Inflation Reduction Act*.

Tal y como hemos adelantado, es harto conocido que el inventario del proceso particional de una comunidad de bienes el pago de las deudas, cargas y obligaciones. En otras palabras, se hace indispensable que los bienes sujetos a liquidación estén libres de toda deuda, obligación y carga. Es incuestionable que toda hipoteca inscrita es una carga real que persigue el bien y que dicha carga real subsiste hasta tanto no se cancele la misma en el Registro de la Propiedad. *Véanse*, 30 LPRA secs. 6081 y 6120. Por tanto, siendo ello así, al igual que las deudas del CRIM de las propiedades, el pago para la cancelación de las hipotecas que cargan la finca Dorín deben incluirse como parte del inventario (activos y pasivos) que se debe efectuar antes de proceder con la liquidación de la comunidad en controversia.

Procede, entonces, devolver el caso al foro primario para se incluyan dentro de los pagos a efectuarse las deudas del CRIM de cada una de las propiedades, así como los honorarios y aranceles y gastos notariales de las cancelaciones de las hipotecas que gravan la finca Dorín dentro del

inventario y posterior a su inclusión, entonces proceder con la etapa final de adjudicación de bienes a las partes de epígrafe libres toda deuda, obligación y carga.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte de este dictamen, *expedimos* el auto de *certiorari* presentado ante nuestra consideración y *revocamos* la *Orden* recurrida.

Se devuelve el caso al foro primario para que se realice la operación particional, conforme lo resuelto en la presente *Sentencia*. Es decir, que se proceda a incluir dentro del inventario el pago de las deudas del CRIM existentes, así como de los honorarios y aranceles y gastos notariales de las cancelaciones de las hipotecas que gravan la finca Dorín y posterior a dicha operación particional, proceder con la etapa final de adjudicación de los bienes a las partes de epígrafe libres de toda deuda, obligación y carga.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones