*590 TEXTO COMPLETO DE LA SENTENCIA
Acude ante nuestra consideración, la parte demandante-apelante, Roche Products Inc., de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo (Hon. Marcos T. Calderón Vázquez, Juez). Mediante dicha sentencia sumaria parcial, el Honorable Tribunal de Primera Instancia desestimó la causa de acción contra los codemandados Ledo. Luis P. Costas Elena y José Maysonet. Por los fundamentos que habremos de exponer, confirmamos la sentencia apelada.
I
El 15 de agosto de 1991, Roche Products Inc., una corporación organizada al amparo de las leyes de la República de Panamá, presentó una demanda contra el Alcalde de Manatí, Juan A. Cruz Manzano, el Director de Finanzas de dicho municipio, Irving A. Piñeiro Colón, el contador público autorizado, Sr. José A. Maysonet y contra el Ledo. Luis P. Costas Elena. Roche Products Inc. se dedica a la manufactura de productos farmacéuticos bajo el Programa de Desarrollo Industrial del Gobierno de Puerto Rico. Antes de que se presentara la demanda que nos concierne, Roche Products Inc. estaba 100% exenta del pago de patentes y otras contribuciones municipales, ello por virtud de la Ley de Incentivos Industriales de 1963, 13 L.P.R.A. see. 252 (reclasificada como see. 10012).
El 17 de diciembre de 1990, el Director de Finanzas del Municipio de Manatí, el Sr. Piñeiro Colón, le envió a Roche Products Inc. una notificación de deficiencia por concepto de patentes municipales para los años fiscales 1979-80 a 1990-91. El monto de dicha deficiencia asciende a trece millones setenta y cuatro mil ciento setenta y tres dólares ($13,074,173.00). Esta cantidad incluye el principal, penalidades e intereses por concepto de recargos. En esa misma fecha, el Sr. Piñeiro Colón le envió a Roche Products Inc. una segunda notificación preliminar de deficiencias por concepto de patentes municipales para los mismos años fiscales, pero esta vez por un negocio de institución financiera que se le atribuye a dicha corporación. La cantidad reclamada es de quince millones veintiún mil setecientos cincuenta y cinco dólares ($15,021,755.00). Por tanto, la suma total asciende a veintiocho millones noventa y cinco mil novecientos veintiocho dólares ($28,095,928.00).
*591 La determinación de las deficiencias de las cantidades contenidas en dicha notificación fue hecha por el contador público autorizado, Sr. Maysonet, quien estaba contratado por el Municipio de Manatí desde el 12 de diciembre de 1989 a base de honorarios contingentes. La determinación de tales deficiencias se hizo de acuerdo a la recomendación del Ledo. Costas Elena. Alega la parte demandante-apelante, Roche Products Inc., que las notificaciones de las antedichas deficiencias constituyen una interferencia con las relaciones contractuales entre el Estado Libre Asociado de Puerto Rico y Roche Products Inc. Además, aduce la parte demandante-apelante que el Municipio de Manatí ha ejercitado el poder sub-delegado a éste en contravención del poder contributivo ejercitado previamente por el Estado bajo la Ley de Incentivos Industriales, supra.
Roche Products Inc. basa su contención respecto a la interferencia con las relaciones contractuales en que quienes han hecho la determinación de su responsabilidad contributiva tienen un interés pecuniario personal, directo y sustiancial en que la decisión sea contraria a los intereses de Roche Products Inc. Por tal motivo, el 14 de enero de 1991, Roche Products Inc. pidió reconsideración de la determinación al Director de Finanzas, Sr. Piñeiro Colón, así como la celebración de una vista administrativa. El 24 de mayo de 1991, el Sr. Piñeiro Colón solicitó unos documentos alegadamente necesarios para evaluar los argumentos esbozados en la reconsideración. El 26 de junio de 1991 se celebró la vista administrativa en las instalaciones de la Alcaldía de Manatí. El 19 de julio de 1991, el Municipio de Manatí le envió a Roche Products Inc. dos notificaciones de determinación final de deficiencia en el pago de patentes municipales en las cuales se confirmaron las notificaciones preliminares.
El 14 de febrero de 1992, mediante una sentencia sumaria parcial, el Tribunal de Primera Instancia, Sala Superior de Arecibo (Hon. Carlos Rodríguez García, Juez), declaró con lugar la demanda de impugnación de patentes municipales presentada por Roche Products Inc., entre otras cosas. Desde dicha sentencia se aclara que la controversia relacionada con el Ledo. Costas Elena y el Sr. Maysonet, sería objeto de una resolución independiente y aparte de las demás reclamaciones. El Tribunal de Primera Instancia pospuso la determinación de las restantes alegaciones hasta la celebración de un juicio plenario.
Posteriormente, el Tribunal de Primera Instancia dictó una segunda sentencia sumaria parcial en la que dispuso de las restantes controversias del caso. Dicha sentencia fue dejada sin efecto, ya que fue dictada sin jurisdicción porque al momento de dictarse estaba pendiente un incidente apelativo sobre la descalificación del bufete que representa a Roche Products Inc., McConnell Valdés. Roche Products Inc. presentó un certiorari que fue denegado por el Tribunal Supremo de Puerto Rico, mediante resolución. Roche Products, Inc. v. Mun. de Manatí, 134 D.P.R. 644 (1993).
Luego de un sinnúmero de trámites procesales relacionados a este caso, el 30 de julio de 1999, el Tribunal de Primera Instancia emitió la sentencia parcial que hoy día analizamos. En ella, el foro a quo concluyó que en este caso no están presentes los requisitos para una reclamación por interferencia culposa con las relaciones contractuales existentes entre el Municipio de Manatí y Roche Products Inc. Luego de esto, el Sr. Maysonet presentó una moción en la que solicitó la desestimación de la apelación. El Ledo. Costas Elena también presentó una moción con el mismo propósito de que se desestimara la apelación. Por su parte, Roche Products Inc. presentó una oposición a dicha moción de desestimación.
El Ledo. Costas Elena aduce que el remedio de la Regla 43.3 de las de Procedimiento Civil, supra, no está disponible en este caso, debido a que fue una sentencia sumaria parcial en un caso con partes múltiples. Sin embargo, nada en la Regla 43.3 de Procedimiento Civil, supra, sobre enmiendas o determinaciones iniciales o adicionales indica que no está disponible para bajo la Regla 43.5, supra, sobre sentencias sobre reclamaciones o partes múltiples. La Regla 43.3 de Procedimiento Civil, supra, está disponible para cualquier tipo de sentencia. Nada en dichas reglas nos indica lo contrario.
El propósito de la Regla 43.3, supra, es brindarle al tribunal sentenciador la oportunidad de enmendar o corregir cualquier error cometido; esto es, hacer cumplida justicia. Sin embargo, sí es necesario que toda *592 moción sobre determinaciones de hechos adicionales constituya una propuesta que exponga con suficiente claridad y especificidad los hechos que el promovente estima probados. Andino v. Topeka, Opinión de 10 de abril de 1997, 97 J.T.S. 46, págs. 875-876. Los propósitos de dicha regla han quedado debidamente satisfechos en la situación de hechos que nos ocupa, por lo que se interrumpió debidamente el término para apelar. Regla 43.4, supra; Andino v. Topeka, supra.
Con el beneficio de la comparecencia de todas las partes y luego de analizar el extenso expediente ante nuestra consideración, procedemos a confirmar la sentencia apelada.
II
Tanto los hechos de este caso, como el derecho en el cual nos sustentamos, nos impiden reconocer en la presente situación de hechos los elementos necesarios para que se constituya la interferencia culposa con las relaciones contractuales o un contrato en daño de tercero. Bajo el Artículo 1802 del Código Civil, 31 L.P.R.A. see. 5141, puede surgir una acción de interferencia con las obligaciones contractuales de otro. Estos son los llamados contratos en daño de tercero. Se alude con esta denominación a las hipótesis en que al celebrar un contrato, y precisamente a causa de su celebración, los contratantes ocasionan un daño a una tercera persona. El daño es la violación de un derecho subjetivo concreto. Luis Diez-Picazo y Antonio Gullón, Sistema de Derecho Civil, 7ma ed., Ed. Tecnos, Madrid, Vol. II, 1995, pág. 97.
Es preciso aclarar que en Dennis, Metro Invs. v. City Fed. Savs., 121 D.P.R. 197, 211 (1988), el Tribunal Supremo manifestó que la figura del contrato de daño de tercero se reconoce en España y es afín y análoga a la figura de interferencia torticera con una relación contractual. El Tribunal estableció en Gen. Office Prods, v. A. M. Capen’s Sons, 115 D.P.R. 553, 558 (1984), que el Artículo 1802, supra, permite la interferencia culposa con las obligaciones contractuales de terceros.
En Gen. Office Prods., supra, se mencionan cuatro requisitos necesarios para que se engrane la figura de interferencia culposa con las obligaciones contractuales de terceros. En primer lugar, debe existir un contrato con el que interfiera un tercero; en segundo lugar, debe mediar culpa. El tercer elemento es que se ocasione daño a un actor y finalmente ese daño debe ser consecuencia de la actuación culposa de un tercero. Estos cuatro requisitos son de carácter copulativo. Dolphin Int’l of P.R. v. Ryder Truck Lines, Vil D.P.R. 869, 879 (1991).
De otra parte, los requisitos que señaló el Tribunal Supremo en Dennis, Metro Invs., supra, para configurar el contrato en daño de tercero son los siguientes: 1) que haya un tercero afectado; 2) que se haya causado un daño a esa tercera persona; 3) que medie un nexo causal entre el daño y el contrato; 4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno sólo de ellos. Como vemos, los requisitos son fundamentalmente idénticos a los de interferencia culposa con relaciones contractuales de otro. Independientemente de qué denominación le demos, los hechos de este caso no nos permiten ubicar a ninguna de ellas en las actuaciones del Ledo. Costas Elena y el Sr. Maysonet. En Dennis, Metro Invs., supra, pág. 213, el Tribunal Supremo resolvió que no hay daño a tercero si simplemente son colocados en situación desfavorable intereses que no son especialmente protegidos. En la presente controversia, los intereses que verdaderamente tienen que protegerse es la relación de confianza que tuvieron que tener los asesores, Sr. Maysonet y Ledo. Costas Elena, para con el Municipio de Manatí.
Los contratos en daño de tercero son aquéllos en los que un tercero, recibe un daño como consecuencia de un contrato, bien sea esa consecuencia querida por las partes que han celebrado el contrato precisamente para producirla, o se haya producido sin esa intención dolosa. Antonio Gullón Ballesteros, En Tomo a los Llamados Contratos en Daño de Tercero, 20 Rev. Der. Not. Ill, 115 (1958). No podemos aseverar que el contrato de servicio habido entre el Municipio de Manatí y el Ledo. Costas Elena y el Sr. Maysonet se haya concretado entre las partes para producir un daño. Sin embargo, tampoco podemos manifestar que la consecuencia de dicho contrato ha sido el causarle daño a Roche Products Inc.
*593 La situación de hechos que nos ocupa trata sobre un contrato de servicios profesionales. El contrato de arrendamiento de servicios queda centrado actualmente en la prestación de los servicios de las denominadas "artes" o "profesiones liberales". En Puerto Rico puede ampliarse o reducirse el ámbito de vinculación obligacional del partícipe. Por ejemplo, puede configurarse el arrendamiento de servicios profesionales del abogado con sujeción a los cánones de ética profesional. Eduardo Vázquez Bote, Teoría General del Contrato, Los Contratos en Especial, Vol. IX, Equity, Hato Rey, 1992, pág. 360.
El contrato de servicios profesionales suscrito entre las partes, obliga al Ledo. Costas Elena a desplegar el máximo cuidado y responsabilidad para con su cliente. De acuerdo al Canon 18 de Etica Profesional, 4 L.P.R. A., Ap. IX, la relación abogado y cliente debe fundamentarse en la absoluta confianza. Sujeto a las exigencias que surgen de las obligaciones del abogado para con la sociedad, las leyes y los tribunales, todo miembro del foro legal le debe a sus clientes un trato profesional caracterizado por la mayor capacidad, la más devota lealtad y la más completa honradez.
Los Cánones 2 y 18 de Etica Profesional imponen a los miembros de la profesión legal el deber de defender los intereses de sus clientes diligentemente, desplegando su máximo conocimiento en la forma generalmente aceptada por los miembros de la clase togada. In re: Pizarro Colón, Opinión de 25 de mayo de 2000, 2000 J.T. S. 128, pág. 1582.
La gestión profesional del abogado debe llevarse a cabo aplicando en cada caso sus conocimientos, experiencia y habilidad, desempeñándose de una forma adecuada y responsable, capaz y efectiva. In re: Acosta Grubb, 119 D.P.R. 595, 602 (1987). Es por todo esto que el Ledo. Costas Elena no podía hacer otra cosa que lo que era su deber, asesorar adecuadamente al Municipio de Manatí en cuanto a las patentes se refiere y en cuanto a cualquier otra cuestión profesional. No podemos penalizar al Ledo. Costas Elena ni al Sr. Maysonet por haber desplegado una conducta profesional al aconsejar al Municipio de Manatí sobre el mejor proceder en lo que respecta al cobro de patentes a Roche Products Inc. En la relación abogado-cliente debe haber la más completa confianza y lealtad, aunque ello perjudique posteriormente los intereses de otro.
Además, el privilegio abogado-cliente que consagra la Regla 25 de Evidencia, 32 L.P.R.A. Ap. IV, protege celosamente esa relación confidencial que se da entre el abogado y su cliente, en este caso en funciones de asesor legal. No existe base en la prueba que demuestre que hubo intención de cometer acto torticero, delito o fraude alguno con la recomendación hecha por el Ledo. Costas Elena. El propósito primordial del privilegio abogado-cliente es el propiciar una comunicación completa y franca entre el cliente y su abogado. Upjohn Co. v. United States, 449 U.S. 383, 387 (1981). Cuando un abogado es consultado por su cliente, deposita en éste la más absoluta confianza. De ordinario, se establece una relación muy estrecha y singular. Este privilegio está fundado en serias consideraciones de política pública y propicia crear un ambiente de seguridad en toda comunicación profesional. Ades v. Zalman, 115 D.P.R. 514, 519 (1984).
Se sentaría un precedente peligroso si se castiga al Ledo. Costas Elena y al Sr. Maysonet por haber hecho y. dicho lo que su conciencia y estudio le dictaron en un momento determinado, aunque se equivocaran en su consejo, como alega Roche Products Inc. El deber del abogado y de todo asesor que se respete a sí mismo, es de serle fiel a su cliente y aconsejar lo que crea más prudente y necesario. Este tipo de relación profesional tiene asidero en un alto grado de responsabilidad, fidelidad, lealtad y honestidad. Esto no se trata de una relación contractual como las demás, sino que los abogados tienen que guiarse por los Cánones de Etica Profesional, cuya consecuencia es ser sincero y genuino con el cliente que solicita los servicios de éste.
Igualmente, el deber de los contadores públicos es asesorar a quien lo contrata, con lo que luego de estudiar los hechos, es el mejor proceder. La Regla 25-A de Evidencia, supra, también cobija ese tipo de relación, basada en la confianza entre el contador público autorizado y su cliente. Más aún, los contadores públicos autorizados se dejan guiar por un Código de Conducta Profesional. La Sección 54, Art. HI de dicho Código, le requiere integridad a estos profesionales. El principio de integridad les exige ser honestos y cándidos y hacer *594 lo que es correcto y justo. El principio de objetividad, Art. IV, Sec. 55 les exige la obligación de ser imparciales, intelectualmente honestos y estar libres de conflictos de interés. Así, también, el debido cuidado, Art. V, Sec. 56, les requiere a los contadores públicos autorizados, la responsabilidad de ejercer sus funciones con competencia y diligencia para el bienestar de aquél para quien realiza el servicio. El Sr. Maysonet no ha violado ninguno de dichos principios, por lo que no nos corresponde poner en entredicho su gestión profesional, en ausencia de prueba que demuestre que no se dejó guiar por el tipo de conducta que imponen las reglas de conducta profesional.
El asesoramiento dado por los codemandados-apelados es una actuación privilegiada que los exonera de responsabilidad. No obstante ello, el resultado de esta controversia no es óbice para que continúen los procedimientos relativos al resto del caso que hoy día nos ocupa. En su momento, los tribunales de justicia harán las determinaciones correspondientes en cuanto a si la causa de acción de Roche Products Inc. contra los demás demandados tiene méritos.
III
Por los fundamentos que anteceden, confirmamos la sentencia objeto de este recurso.
Lo acordó y ordena el Tribunal y lo certifica la Subsecretaría General.
Gladys E. Ortega Ramírez
Secretaria General
ESCOLIOS 2001DTA 9
1. El Art. Ill, Sección 54, lee.

"Integrity is an element of character fundamental to professional recognition. It is the quality from which the public trust derives and the benchmark against which a member must ultimately test all decisions. Integrity requires a member to be, among other things, honest and candid within the constraints of client confidentiality. Service and the public trust should not be subordinated to personal gain and advantage. Integrity can accommodate the inadvertent error and the honest difference of opinion; it cannot accommodate deceit or subordination of principle.

Integrity is measured in terms of what is right and just. In the absence of specific rules, standards, or guidance, or in the face of conflicting opinions, a member should test decisions and deeds by asking: 'Am I doing what a person of integrity would do?' Integrity requires a member to observe both the form and the spirit of technical and ethical standards; circumvention of those standards constitutes subordination of judgment."

2. El inciso .01 de dicha Sección 55 reza:

"Objectivity is a state of mind, a quality that lends to a member's services. It is a distinguishing feature of the profession. The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest. Independence precludes relationships that may appear to impair a member's objectivity in rendering attestation services."

3. La Sección 56, inciso .01, ordena como sigue:

"The quest for excellence is the essence of due care. Due care requires a member to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability with concern for the best interest of those for whom the services are performed and consistent with the profession's responsibility to the public."